## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| HARKLESS *et al*, | ) | CASE NO:  1:06-cv-02284 |
| | ) | |
| Plaintiffs, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| HUSTED *et al*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

This matter is before the undersigned Magistrate Judge upon referral pursuant to

28 U.S.C. § 636 and Local Rule 72.2 for the purpose, among other things, of issuing a

Report and Recommendation on the motion for attorney's fees and costs, Doc. 89, filed

on behalf of the Association of Community Organizations for Reform Now[1] ("ACORN"),

Carrie Harkless ("Harkless") and Tameca Mardis ("Mardis") (collectively "Plaintiffs").  For

the reasons set forth in this Report, the Magistrate Judge recommends that Plaintiffs be

awarded attorney's fees in the amount of $544,852, and costs and expenses in the

amount of $120,037.80.

### PROCEDURAL HISTORY

Plaintiffs filed the Complaint against J. Kenneth Blackwell in his official capacity

as Secretary of State ("SOS") and Barbara Riley in her official capacity as Director of

the Department of Job and Family Services ("DJFS") (collectively "Defendants") on

---

[1] While the fee request was pending, ACORN filed a Chapter 7 Bankruptcy
petition.  David J. Doyaga, Esq., Bankruptcy Trustee for ACORN, substituted
as a party for ACORN.

September 21, 2006.

On October 16, 2006, Defendants filed separate Motions to Dismiss.  Doc. 4 *and*

6.  On November 17, Plaintiffs filed an unsigned opposition to those motions.  Doc. 10.

The Court held a Case Management Conference on that same date, and subsequently

entered a scheduling order.  On December 7, each Defendant filed a reply to Plaintiffs'

opposition brief.  Doc. 13 *and* 14.  On December 28, 2006, the Court issued a

memorandum of opinion and entered judgment dismissing the case.  Doc. 15 *and* 16.

On January 12, 2007, Plaintiffs filed a motion for reconsideration along with an

unsigned memorandum in support and a proposed Amended Complaint.  Doc. 17 *and*

18.  After several stipulations, Defendants filed separate responses to the motion for

reconsideration in late February 2007.  Doc. 21 *and* 22.  After further stipulations, the

parties jointly requested a stay of the action on May 4, 2007, so that they could engage

in the settlement of another case that could impact this case.  Doc. 27.[2]  By way of an

entry on May 8, 2007, the Court treated the motion as a request to stay resolution of the

pending Motion for Reconsideration, and granted the motion; but, as the case had been

removed from the Court's docket upon issuance of the judgment entry, the Court

denied the Motion for Reconsideration as moot and indicated that if Plaintiffs intended

to proceed with the Motion for Reconsideration, they should refile the motion. Doc. 28.

On June 6, 2007, Plaintiffs refiled their Motion for Reconsideration and

memorandum in support, Doc. 29 and 30, as well as an appeal of the Court's

---

[2]  The request stated:  "The reason for the request is to permit settlement
discussions in a separate action, *League of Women Voters v. Brunner*, Case
No. 05-7309 (N.D. Ohio), to proceed because, if successful, a resolution of that
action may well moot the disputed issues in this action."

December 28, 2006, and May 8, 2007, orders.  Doc. 31.  The Motion for

Reconsideration, for the most part, reargued the same arguments Plaintiffs made in

opposition to the motions to dismiss, except it added a proposed amended complaint to

bolster the argument pertaining to ACORN's standing.  Defendants refiled their

separate responses to the Motion for Reconsideration, Doc. 32 and 33, on June 26,

2007.  On July 7, 2007, Plaintiffs filed their reply brief.  Doc. 35.  On August 10, the

Court denied the Motion for Reconsideration.  Doc. 36.  On September 7, 2007,

Plaintiff's appealed the denial of the Motion for Reconsideration.  Doc. 37.

On October 28, 2008, the Sixth Circuit issued an information copy of its opinion

reversing and remanding the case to this Court.  Doc. 39.  The mandate issued on

February 4, 2009.  Doc. 42.

During the pendency of this case before the Sixth Circuit, Jennifer Brunner

became Secretary of State ("SOS") and substituted as the named party in place of

Kenneth Blackwell; and Helen Jones-Kelley became the director of the DJFS and

substituted as the named party in place of Barbara Riley.  *Harkless v. Brunner*, 545

F.3d 445, 448 n.1 (6th Cir. 2008).

Upon remand, Plaintiffs never filed their amended complaint.  It is not an

operative pleading in this case.  Defendants answered the original complaint.  Judge

Gaughan held a settlement conference on March 20, 2009, and set new case

management deadlines.  On July 6, 2009, the director of the DJFS filed an offer of

judgment.  Doc. 54.  Upon joint motion of the parties, Judge Gaughan referred the

matter to this Court for mediation, and a settlement conference was held on August 18,

2009.  All parties filed position papers in advance of the mediation.  In the interim, the

DJFS filed a motion to compel ACORN to answer interrogatories and produce documents relating to the issue of ACORN's standing and registration efforts by the individual Plaintiffs.  The matter resolved expeditiously with some Court intervention and some agreement of the parties.  Due to the Court's immediate intervention in the matter, Plaintiffs did not file a brief regarding this matter.  Doc. 58, 59, 62, 63 *and* 64.

On September 30, 2009, the DJFS filed another motion to compel and a request to conduct additional discovery, Doc. 65, and alleged that a recent deposition raised questions about the thoroughness of ACORN's production of documents.  The Court promptly held a telephone conference regarding this matter, scheduled a second conference and entered certain orders regarding the issues.  Doc. 66, 72 *and* 74.  Due to the Court's immediate intervention in this matter, ACORN did not file a response brief.

During these telephone conferences, the parties requested that another mediation be held, which the Court scheduled for October 30, 2009.

ACORN filed a motion to compel and for sanctions on October 13, 2009 Doc. 68, 69 and 70, seeking the deposition of the SOS and alleging, among other things, that she or her office destroyed evidence.  On the following day, the Court set a briefing schedule.  The SOS filed an opposition brief on October 21, 2009, Doc. 78, and Plaintiffs filed a reply on October 23, 2009, Doc. 80.

The parties filed position papers for the mediation, which was held on October 30, 2009, and continued to November 5, 2009.  As the parties reached a settlement ("Settlement Agreement") on November 5, 2009, the outstanding discovery issues were moot.  The parties did not, however, reach an agreement on the issue of attorney's fees

-4-

and costs, but agreed to submit that to the Court for determination.  Doc. 84, 85.  The

parties filed a Notice of Executed Settlement Agreement on November 25, 2009.

After Plaintiffs filed their motion for attorney's fees and costs on February 22,

2010, Doc. 89, Defendants conducted discovery and filed their separate responses,

Doc. 109 and 114.  Plaintiffs filed a reply.  Doc. 117.  The parties filed numerous

affidavits/declarations and depositions in support of their respective positions.  *See*

Doc. 88-117.  As Defendants alleged that ACORN had dissolved and raised questions

about whether such a dissolution would allow ACORN to recover fees, the Court

ordered ACORN to address the issue.  Doc. 118, 120.  Subsequently, counsel for

ACORN notified the Court that ACORN would be filing for bankruptcy, Doc. 124, and

then that it had, in fact, filed Chapter 7 Bankruptcy, Doc. 125.[3]

Pursuant to a stipulation of the parties, Judge Gaughan entered judgment on

March 22, 2011.  Doc. 138.  The stipulation of the parties also substituted David J.

Doyaga, the Bankruptcy Trustee for ACORN, as a plaintiff, substituted Jon Husted as

SOS, and substituted Michael Colbert as the Director of DJFS.  Doc. 137.

## THE UNDERLYING LITIGATION

The Complaint alleges a single claim for relief, that is, that Defendants violated

Section 7 of the National Voter Registration Act ("NVRA" or "the Act"), 42 U.S.C. §

1973gg, by failing to provide voter registration and information at public assistance

---

[3] At first the parties indicated that the automatic stay provisions of the
Bankruptcy Code would not apply.  But, Defendants also argued that the
Bankruptcy Trustee would have to authorize the suit and substitute as a party.
After some confusion and dispute on that point, the Bankruptcy Trustee
authorized the suit and substituted as a party for ACORN on or about February
25, 2011.

agencies in Ohio.[4]  With regard to Plaintiffs, it alleges the following.  Harkless and

Mardis are Ohio citizens who receive public assistance through programs administered

by the DJFS.  Harkless was previously registered to vote in Ohio, but has since moved

and has not changed her voter registration address.  Harkless has not been offered the

opportunity to register to vote or change her voter registration address on any of her

visits to the DJFS.  Mardis is not registered to vote and has not been offered the

opportunity to vote on any of her visits to the DJFS.

ACORN, a non-profit organization incorporated in Louisiana, with offices in

Akron, Cincinnati, Columbus, Dayton and Toledo, Ohio, has more than 5,600 members

in its six Ohio Chapters, and has expended substantial time and resources to make

voter registration available to low income citizens.  Such voter registration efforts would

have been unnecessary had Defendants complied with the NVRA.  In addition, the

Complaint alleges many of ACORN's members receive public assistance and should be

offered the opportunity to vote and/or to change their voter registration addresses

---

[4] The Complaint alleges, among other things, that the SOS, who is the chief elections official responsible for overseeing the elections process in Ohio, failed in his oversight role to ensure compliance with the NVRA and failed to implement a program to monitor the DJFS's compliance with the NVRA.  It alleges that the DJFS, the state agency administering public assistance programs subject to the NVRA—that is, Food Stamps, Medicaid, Ohio Works First, the Prevention, Retention and Contingency Program, and Disability Financial Assistance—failed to assist applicants in completing voter registration forms, to accept voter registration forms, to inquire of every applicant, in writing, whether he would like to register to vote or change his registration address and to explain that the decision whether to register will not affect eligibility for benefits.  It also alleges that DJFS failed to distribute voter registration application forms and failed to distribute voter registration materials with each application, recertification, renewal, or change of address relating to an applicant's receipt of public assistance.

during visits to DJFS offices.

Judge Gaughan granted Defendants' motion to dismiss, ruling (1) that ACORN lacked standing to sue on its own behalf, and (2) relying upon *United States v. Missouri*, No. 05-4391-CV-C-NKL, 2006 WL 1446356 (W.D. Mo. May 23, 2006), that the SOS was not a proper party to the suit because the county DJFS offices, pursuant to the Ohio Revised Code and the Ohio Administrative Code, had the duty to implement procedures designed to comply with the NVRA and the SOS was not responsible for the enforcement of the NVRA against county DJFS offices.

Plaintiffs appealed after the Court denied their motion for reconsideration.[5]  On appeal, the Sixth Circuit reversed the district court.  *Harkless*, 545 F.3d at 459.  In its decision, the Sixth Circuit analyzed the NVRA and concluded that both the SOS and the Director of the DJFS were proper parties to the suit.  *Harkless*, 545 F.3d at 455, 458.  In doing so, the court distinguished *United States v. Missouri*, No. 05-4391-CV-C-NKL, 2006 WL 1446356 (W.D. Mo. May 23, 2006), and noted that the Missouri district court had been reversed.  *Harkless*, 545 F.3d at 453.

The Sixth Circuit declined to address the issue of standing, but held that the district court erred in denying Plaintiffs leave to file an amended complaint that specifically alleged ACORN would not have expended funds on voter registration outside DJFS offices if Defendants had not violated the Act (injury in fact) and that ACORN has members who have been injured by Defendants' failure to comply with the Act (associational standing).  *Harkless*, 545 F.3d at 458.

_____

[5] The district court considered this to be a motion to alter or amend judgment pursuant to Rule 59(e).

## ATTORNEY'S FEES AND COSTS

After voluntarily subtracting an across the board reduction of 5% to adjust for "duplication," Plaintiffs have requested fees based upon hours expended in the amount of (1) $2,716,016.74 (applying counsel's "home" rates in New York, Washington and Boston), or (2) alternatively, $1,485,455.67 (applying rates in the Northern District of Ohio).  In support of their request for fees at their "home" rates, Plaintiffs argue that no local lawyers had the knowledge and expertise in this "highly complex and specialized" area of law and the resources to pursue the claim.  Pls.' Mem. Law 15, Doc. 90.  Further, they assert that "no local lawyer proved willing to undertake an action of this magnitude and litigate against state officials."  *Id*.  In alternatively seeking Cleveland rates, Plaintiffs have based their proposed hourly rates upon the rates charged by the "most prominent" Northern District of Ohio law firms in complex Chapter 11 bankruptcy proceedings (described by Plaintiffs as "the most complex and challenging matters they handle for fee-paying clients").  *Id.* at 16.

The fee request represents the hours expended by individuals from 4 organizations, the Dechert law firm[6], DEMOS, the Lawyers' Committee and Project Vote.

---

[6] The Dechert firm does not seek reimbursement for any time spent by summer associates, attorneys, paralegals or litigation clerks who spent less than a total of 20 hours on the case.  Steiner Decl. ¶ 17, Doc. 89-1.

| Organization | Home | Home Less 5% | Cleveland | Cleveland Less 5% |
|---|---|---|---|---|
| Dechert | $1,365,482.50 | $1,297,208.37 | $687,530.00 | $653,153.50 |
| DEMOS | $909,865.00 | $864,371.75 | $509,970.00 | $484,471.50 |
| Lawyers' Committee | $424,960.00 | $403,712.00 | $233,980.00 | $222,281.00 |
| Project Vote | $158,657.50 | $150,724.62 | $132,136.50 | $125,549.67 |
| Total: | | $2,716,016.74 | | $1,485,455.67 |

Steiner Decl. ¶ 26, Doc. 89-1.  The request reflects hours for 21 attorneys and 4 paralegals/law students:  10 individuals from Dechert (9 attorneys and 1 paralegal), 6 individuals from DEMOS (4 attorneys, 1 paralegal and 1 law student), 4 attorneys from the Lawyers' Committee, and 5 individuals from Project Vote (4 attorneys and 1 law student).  Plaintiffs claim that a core team of 6 attorneys[7] performed the overwhelming amount of work and allocated work and responsibilities to maximize efficiency and avoid duplication.  Pls.' Mem. Law 12, Doc. 90.  The hourly rates range from a "home" rate of $200 per hour (law student rate) to $800 per hour, and a Cleveland rate of $100 per hour to $450 per hour.  Steiner Decl. at 9-11, Doc. 89-1.  According to this Court's calculation, the hours reported from all 4 groups total 4,924.6 hours and, after a 5% reduction, total 4,678.37 hours.

---

[7] These lawyers are identified as Steiner and Topp from Dechert, Danetz and Chapman from DEMOS, Kengle from the Lawyers' Committee and James from Project Vote.

A summary of the hours claimed is set forth below:

**Dechert**

| Person | Hours | Rate Home | Cleveland | Total Home | Cleveland |
|---|---|---|---|---|---|
| Neil A. Steiner | 732.8 | $725 | $400 | $531,280.00 | $293,120.00 |
| Robert W. Topp | 929.2 | $590 | $300 | $548,228.00 | $278,760.00 |
| Elliot M. Gardner | 199.4 | $490 | $200 | $97,706.00 | $39,880.00 |
| William Gibson | 173.9 | $490 | $200 | $85,211.00 | $34,780.00 |
| Kira N. Brereton | 64.6 | $390 | $200 | $25,194.00 | $12,920.00 |
| Mimi P. Singh | 26.3 | $375 | $100 | $9,862.50 | $2,630.00 |
| Timothy C. Gibbs | 31.5 | $335 | $100 | $10,552.50 | $3,150.00 |
| Paul M. Orzea | 25.5 | $335 | $100 | $8,542.50 | $2,550.00 |
| Marc L. Penchansky | 20.4 | $315 | $100 | $6,426.00 | $2,040.00 |
| Bernard G. Powell | 177.0 | $240 | $100 | $42,480.00 | $17,700.00 |

**DEMOS**

| Person | Hours | Rate Home | Cleveland | Total Home | Cleveland |
|---|---|---|---|---|---|
| Brenda Wright | 170.70 | $800 | $450 | $136,560.00 | $76,815.00 |
| Lisa Danetz | 741.10 | $700 | $400 | $518,770.00 | $296,440.00 |
| Allegra Chapman | 301.00 | $550 | $300 | $165,550.00 | $90,300.00 |
| Susan Gershon | 76.90 | $350 | $200 | $26,915.00 | $15,380.00 |
| Scott Novakowski | 137.85 | $200 | $100 | $27,570.00 | $13,785.00 |
| Oliver Sloman | 172.50 | $200 | $100 | $34,500.00 | $17,250.00 |

**Lawyers' Committee**

| Person | Hours | Rate Home | Cleveland | Total Home | Cleveland |
|---|---|---|---|---|---|
| Jon Greenbaum | 69.2 | $800 | $450 | $55,360.00 | $31,140.00 |
| Robert Kengle | 416.5 | $800 | $450 | $333,200.00 | $187,425.00 |
| Benjamin Blustein | 14.7 | $800 | $450 | $11,760.00 | $6,615.00 |
| Phil Dupre | 70.4 | $350 | $125 | $24,640.00 | $8,800.00 |

**Project Vote**

| Person | Hours | Rate Home | Cleveland | Total Home | Cleveland |
|---|---|---|---|---|---|
| Nicole Kovite | 83.8 | $450 | $300 | $37,710.00 | $25,140.00 |
| Teresa James | 202.3 | $450 | $450 | $91,035.00 | $91,035.00 |
| Brian Mellor | 14.45 | $800 | $450 | $11,560.00 | $6,502.50 |
| Donald Wine | 21.9 | $375 | $200 | $8,212.50 | $4,380.00 |
| Ari Savitzky | 50.7 | $200 | $100 | $10,140.00 | $5,070.00 |

*Id.* at 14.

Plaintiffs' counsel also contend that they provided superior legal service and obtained an "outstanding" and "superb" result.  In support of this assertion, Plaintiffs, apparently extrapolating from 13,746 voter registration applications or change of address forms reportedly submitted by DJFS offices in January 2010 (the first month of reform as set forth in the Settlement Agreement), allege that more than one hundred thousand otherwise unregistered low-income Ohioans will register to vote or update their voter registration addresses as a consequence of this litigation.  Further, they assert that the litigation produced a precedent-setting decision in the Sixth Circuit

-11-

pertaining to state compliance with voting rights laws.

Plaintiffs also seek $126,440.81 for "out-of-pocket" costs.  In support of their requests for fees and costs, Plaintiffs have submitted numerous declarations of attorneys working on the case, their biographies, billing records, Chapter 11 fee petitions from large Cleveland law firms, and the declaration or affidavit of expert witnesses Richard Kerger (attorney) and Thomas D. Lambros (former Chief Judge of this Court).

The SOS strongly opposes the request for fees on the following grounds.  In general, the SOS maintains:  (1) counsel obtained no practical or enforceable relief for their clients; (2) counsel "over-lawyered," the case; (3) the time records are questionable, not genuine, rewritten and/or not the same as the ones submitted to their expert, Mr. Lambros; and (4) the rates and hours are unreasonable.  In addition, the SOS cites numerous specific examples as a basis for questioning the reliability of the time records (*e.g.*, times rounded to an even hour or half hour in some cases, lack of chronological order in individual billing records, rewritten entries, vague descriptions) and gives numerous examples in support of the claim that Plaintiffs' counsel duplicated work, billed for non-compensable events (*e.g.*, attending a press conference and time spent recruiting clients), and expended an unreasonable amount of time on specific tasks.  The SOS argues that fees should be denied in their entirety because such abuses permeate the fee request to such a degree that the fees requested are "so excessive so as to shock the conscience of the court."  SOS Mem. Law 27, Doc. 109. Alternatively, if fees are awarded, the SOS suggests that the award should be $190,000 (a 90% reduction) to reflect the "inconsequential success" of the case.  *Id.* at 46.  In this

regard, the SOS asserts that the two individual Plaintiffs, Harkelss and Mardis, received no benefit from the litigation.  They claim (1) Mardis was a registered voter at the time the lawsuit was filed, and re-registered to vote 6 times while the litigation was pending; (2) the Lorain County DJFS office provided Harkless, who is a registered voter, with voter registration material; and (3) ACORN no longer conducts voter registration activities in Ohio and, at the time of the SOS's original response, was in the process of dissolving, and subsequently filed a Chapter 7 bankruptcy petition.

In addressing the number of new voter registration applications and change of address forms submitted by DJFS offices, the SOS responds that volume alone is a "false metric" because it only indicates that individuals are completing paperwork; the SOS submits that the relevant issue is how many of the new applications reflect *new* registrants, as opposed to people already registered to vote and merely completing forms provided to them.  By way of example, the SOS points out that Plaintiff Mardis has re-registered 6 times.  The SOS also questions a number of expenses.

The DJFS filed a separate brief and adopted the arguments made by the SOS. In addition, the DJFS characterizes this case as being brought, not as litigation on behalf of discreet clients, but rather as a suit conceived by policy experts in public interest organizations that wanted Ohio to change its voter registration process, and only thereafter recruited clients.  The DJFS asserts that this approach infused the entire litigation with an inappropriate focus and caused Plaintiffs' lawyers to prosecute the case on a policy basis, rather than on a litigation/client basis, and led to decision making by a committee of up to 8 lawyers.  This, it claims, resulted in over-lawyering, duplication, and broader than necessary discovery, in large part because Plaintiffs

conducted discovery in all 88 counties even though the individual Plaintiffs resided in only 2 counties (Lorain and Cuyahoga) and ACORN operated in only six counties (including Lorain and Cuyahoga). It further contends that the legal and factual issues were not particularly complex, that the case involved the interpretation of a single federal statute and its application under Ohio law, that Plaintiffs ignored a proposed stipulation offered by the DJFS admitting the DJFS did not seek to force counties to comply with the NVRA prior to October 2008, and that Plaintiffs unreasonably "broke-off" settlement negotiations before discovery because of an insistence on terms that Plaintiffs later abandoned. The DJFS claims that the additional discovery wasted time and did not lead to anything of substance beyond what the DJFS had already voluntarily changed and/or had agreed to change. Furthermore, the DJFS challenges Plaintiffs' "home" rates, travel rates, and Cleveland rates. The DJFS argues that the Cleveland rates requested are higher than the Cleveland market warrants and that Plaintiffs have not demonstrated that they made any effort to obtain counsel in the local market. The DJFS also challenges the expenses sought and argues that counsel should not be fully reimbursed for travel time. Like the SOS, the DJFS argues that no fees should be awarded and, alternatively, that any fees awarded should be substantially reduced[8] and "cut off" as of July 6, 2009, when the DJFS made an offer of judgment.

---

[8] The DJFS proposes that the fees be reduced by 80% and alleges that there was a relative lack of success because: (1) the Defendants implemented changes absent any court order; (2) the case was delayed because Plaintiffs clung to (and later abandoned) extreme settlement demands; and (3) the settlement is limited to actions defendants were already performing." DJFS Mem. Opp'n 16, 32, Doc. 114.

-14-

Defendants have submitted a number of declarations/affidavits, depositions and exhibits in support of their opposition.

Plaintiffs reply that Harkless already has benefitted from the settlement as she was able to change her voter registration address through the DJFS in March 2010 and dispute that the final Settlement Agreement "closely mirrors" the DJFS pre-discovery offer.  Plaintiffs also challenge a lack of evidence submitted by Defendants in general and reiterate their positions as to reasonableness, submitting additional declarations and exhibits in support of their reply.  They also take strong exception to Defendants' challenge to the integrity and accuracy of the billing.

On August 17, 2010, this Court directed ACORN to respond to Defendants' argument that ACORN received no benefit from the suit because it had dissolved, or was in the process of dissolving.[9]  ACORN responded that it had not dissolved and had no plans to dissolve, and, although ACORN withdrew its license to do business in Ohio, it did not do so until March 31, 2010, more than four months after the parties entered into the Settlement Agreement and after thousands of voter registration applications and changes of address had been collected by DJFS offices.  The affidavit of Mr. Schwartz indicates that ACORN had "not dissolved or filed for bankruptcy protection, and [had] no plans to dissolve or file for bankruptcy."  Schwartz Decl. ¶ 2, Doc. 121. ACORN argued that even though it was no longer conducting voter registration or doing business in Ohio, that did not detract from the substantial benefit obtained because the

---

[9] Specifically, the Court directed ACORN to indicate whether ACORN had dissolved or was in the process of dissolving and, if so, to respond to additional questions.  Doc. 118.

successful resolution of the case would have enabled ACORN to reduce or eliminate

the time spent in Ohio on voter registration.  The affidavit further emphasizes that

Plaintiff ACORN was the national ACORN organization, not the local Ohio Chapter.

While this fee request was pending, counsel for ACORN notified this Court in

writing on November 3, 2010, that ACORN had filed a petition for Bankruptcy under

Chapter 7 of the Bankruptcy Code in the Eastern District of New York.  Doc. 125.

All parties agreed that the automatic stay provisions of the Bankruptcy Code did not

apply to this case.  However, Defendants asserted that fees belong to the party, not the

lawyer, and that the bankruptcy filing meant ACORN no longer had standing to pursue

attorney's fees without some action or approval by the bankruptcy trustee.  In addition,

Defendants asserted that their previous arguments that ACORN derived no direct

benefit from the Settlement Agreement were amplified by the bankruptcy because:

ACORN no longer exits, does not have any members, cannot register individuals to

vote, and will not have any power to enforce the Settlement Agreement.

In its response, ACORN did not address the standing issue.  It primarily focused

on the result and asserted that the benefits of the litigation are to be evaluated as of the

time of the Settlement Agreement, and that the individual Plaintiffs derived benefits

from the Settlement Agreement because redress of their rights necessarily required

systemic changes to Ohio's voting procedures.

## I.  Applicable Law

Plaintiffs' request for fees and cost is brought pursuant to Section 11 of the

NVRA, 42 U.S.C. § 1973gg-9, which provides for a private right of action, 42 U.S.C. §

19733gg-9(b), and states that a court may allow a prevailing party reasonable attorney

fees, including litigation expenses and costs, 42 U.S.C. § 19733gg-9(c).  In this case,

the parties entered into a settlement agreement, which Plaintiffs filed with the court as a

"Notice of Executed Settlement Agreement."  Doc. 85.[10]  In the Settlement Agreement,

the parties agree that Plaintiffs are the prevailing parties in the litigation.[11]

Although the fee shifting statute gives a court discretion to award fees, a

prevailing party should recover reasonable attorney's fees and costs "unless special

circumstances would render such an award unjust."  *Hensley v. Eckerhart*, 461 U.S.

424, 433 n.7 (1983); a*ccord Nat'l Coal. for Students with Disabilities v. Bush*, 173 F.

---

[10]  Although the Settlement Agreement contains language that the Court will
order and enforce certain provisions of the Settlement Agreement, the
Settlement Agreement is not a consent decree, is not a court order and does
not contain a signature line for the Court.  Nor did Plaintiffs, upon filing the
Settlement Agreement, request any action by the Court to adopt the provisions
of the agreement into a court order.  The parties subsequently submitted a
proposed judgment entry for the Court, however, in which the Court enters
final judgment and retains continuing jurisdiction to enforce the Settlement
Agreement.  Doc. 137.  The Court dismissed the case pursuant to that
stipulation.  Doc. 138.  Whether fees after a settlement are recoverable can be
an issue in some cases if the settlement agreement is not subject to judicial
approval and oversight.  *See Nat'l Coalition for Students with Disabilities v.
Bush*, 173 F. Supp. 2d 1272, 1276-78 (N.D. Fla. 2001).  This is not an issue in
this case because the parties have agreed that Plaintiffs are entitled to
recover fees.

[11]  The Settlement Agreement provides:

x. Costs/attorney fees
Plaintiffs shall be entitled to recover reasonable attorney's fees and
expenses related to the litigation. The parties shall participate in a
mediation regarding the amount of fees and expenses on December
21, 2009, with Magistrate Judge Vecchiarelli.  If the parties cannot
agree to the amount of fees and expenses at that mediation, Plaintiffs
shall make an application for fees and expenses to Judge Gaughan.

Settlement Agreement 15-16, Doc. 85.

Supp. 2d 1272, 1274 (N.D. Fla. 2001).[12]  A fee request made by a prevailing party may

be denied in its entirety if it is "so excessive it shocks the conscience of the court," *e.g.*,

if the hours claimed by counsel are grossly exaggerated, *Sham v. Dist. Courts Trying

Criminal Cases*, 148 F.3d 554, 557 (5th Cir. 1998), *abrogated on other grounds by

Bailey v. Mississippi*, 407 F.3d 684 (5th Cir. 2005), if the fee request fails to distinguish

time spent on distinct successful and unsuccessful claims, *Fair Housing Council v.

Landow*, 999 F.2d 92, 97 (1st Cir. 1993), or the fee is otherwise egregious, *Brown v.

Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980) (rejecting a bill in its entirety when 800

hours of time were claimed on a simple case requiring little legal skill).  *See also Sun

Publ'g Co. v. Mecklenburg News, Inc.,* 823 F.2d 818 (4th Cir. 1987) (finding that six

lawyers from three different firms billing significant time in preparing for a simple issue

"overstepped the bounds of reason and conscience" in their third fee request).  Where

the fee request is outrageous, the district court need not *sua sponte* determine the

reasonable amount of fees, but may reject the fee request in its entirety.  *Brown*, 612

---

[12]  In the *Students with Disabilities* case, the district court stated:

> In cases arising under the National Voter Registration Act, *see* 42
> U.S.C. § 1973gg-9(c), as in cases arising under 42 U.S.C. § 1983 and
> certain other civil rights statutes, *see* 42 U.S.C. § 1988, the court
> "may" award the "prevailing party" a reasonable attorney's fee.
> Although these attorney's fee provisions speak in discretionary terms,
> a prevailing plaintiff ordinarily is entitled to an award of fees, unless
> special circumstances would render such an award unjust. *See, e.g.,
> Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct.
> 964, 19 L.Ed.2d 1263 (1968); *Riddell v. National Democratic Party*,
> 624 F.2d 539, 543 (5th Cir.1980).

*Students with Disabilities*, 173 F. Supp.2d at 1276.

F.2d at 1059.  In *Brown*, the Seventh Circuit opined:

> If, as appellant argues, the court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such conduct would be reduction of their fee to what they should have asked for in the first place.

*Id.* at 1059.

On the other hand, the complete denial of fees "is a stringent sanction, to be reserved for only the most severe of situations, and appropriately invoked only in very limited circumstances." *Jordan v. U.S. Dep't of Justice*, 691 F.2d 514, 518 (D.C. Cir. 1982) (reversing district court order completely denying request for fees as an abuse of discretion).  The Sixth Circuit, following this approach, requires the non-prevailing party to make a "strong showing" of special circumstances to justify a complete denial of fees to a prevailing party.  *Deja Vu of Nashville, Inc. v. Nashville & Davidson Cnty.*, 421 F.3d 417, 422 (6th Cir. 2005); a*ccord Project Vote v. Blackwell*, No. 1:06-cv-1628, 2009 WL 917737, at *4 (N.D. Ohio 2009) (O'Malley, J.) (addressing the principles but finding a reduction of fees was more appropriate than a complete denial of fees).

Once a court determines that a party is entitled to fees and costs as a prevailing party, the primary concern is whether the fee is reasonable.  *Blum v Stenson*, 465 U.S. 886, 893-95 (1984); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).  In determining a reasonable fee, the starting point is to determine the "lodestar," calculated by multiplying the number of hours reasonably expended by a reasonable hourly rate.  *Hensley*, 461 U.S. at 434; *Isabel v. Memphis,* 404 F.3d 404, 415 (6th Cir.

2004).  The party seeking attorney's fees bears the burden of proving the reasonableness of the hours and the rates claimed.  *Hensley*, 461 U.S. at 433-34.  A prevailing party is not entitled to recover for "hours that are excessive, redundant, or otherwise unnecessary."  *Id.* at 434.[13]

The court determines the reasonableness of the claimed hourly rates by reference to the prevailing market rate in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel.  *See Johnson v. Clarksville*, 256 F. App'x 782, 783 (6th Cir. 2007), *citing Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989).  Where counsel voluntarily undertakes representation in a foreign market, the relevant market and rate generally:

> is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices, at least where the lawyer's reasonable "home" rate exceeds the reasonable "local" charge.

*Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000), *citing Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir.1997).  A reasonable fee is "one that is adequate to attract competent counsel, but that does not produce windfalls to attorneys."  *Blum*, 465 U.S. at 897 (internal quotes and citation omitted); a*ccord Geier*, 372 F.3d at 791.  The Sixth Circuit has described reasonable hourly rates as those that "do not exceed the

---

[13]  Indeed, the Sixth Circuit has noted that "Plaintiffs are not entitled to have any number of well-qualified attorneys reimbursed for their efforts, when fewer attorneys could have accomplished the job."  *Ky. Rest. Concepts, Inc. v. Louisville*, 117 F. App'x 415, 419 (6th Cir. 2004) (quoting the district court below with approval).

market rates necessary to encourage competent lawyers to undertake the

representation in question."  *Coulter v. Tennessee*, 805 F.2d 146, 149 (6th Cir. 1986).

In further describing these rates, the *Coulter* court stated:

> The statutes use the words "reasonable" fees, not "liberal" fees.  Such fees
> are different from the prices charged to well-to-do clients by the most noted
> lawyers and renowned firms in a region.  Under these statutes a renowned
> lawyer who customarily receives $250 an hour in a field in which competent
> and experienced lawyers in the region normally receive $85 an hour should
> be compensated at the lower rate.  We therefore apply the principle that
> hourly rates for fee awards should not exceed the market rates necessary to
> encourage competent lawyers to undertake the representation in question.

*Id.* (footnote omitted).

The party seeking attorney's fees also bears the burden of proving the

reasonableness of the hours billed and must exclude hours that are "excessive,

redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  Attorneys seeking

fees must maintain time records that are sufficiently detailed to allow the court to

determine the reasonableness of the hours expended with a high degree of certainty

that the hours were actually expended.  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d

531, 553 (6th Cir. 2008).[14]  There can be three different types of issues concerning

---

[14]  The Sixth Circuit has noted:

> Courts in this circuit have reduced attorney fees on the basis of
> insufficient billing descriptions where the attorney did not "maintain
> contemporaneous records of his time or the nature of his work,"
> *Keener v. Dep't of the Army*, 136 F.R.D. 140, 147 (M.D.Tenn. 1991),
> *aff'd on decision of the district court by Keener v. Dep't of the Army*,
> No. 91-5442, 1992 WL 34580, 1992 U.S.App. LEXIS 2822 (6th Cir.
> Feb. 24, 1992), and where billing records "lumped" together time
> entries under one total so that it was "impossible to determine the
> amount of time spent on each task."  *Cleveland Area Bd. of Realtors
> [v. Euclid]*, 965 F. Supp. [1017,] at 1021 [(N.D. Ohio 1997)].  On the
> other hand, this court has upheld an award of attorney fees and found

excessive hours:  (1) factual questions about whether the work was actually performed;

(2) legal questions about whether the work performed was sufficiently related to the

issues on which the plaintiff prevailed; and (3) mixed questions involving billing

judgment and whether counsel spent too much time on particular tasks or unnecessarily

duplicated the work of co-counsel.  *Coulter*, 805 F.2d at 150-51.  A trial court's

determination that hours are excessive or duplicative is a finding of fact subject to a

clearly erroneous standard of review.  *Wayne v. Sebring*, 36 F.3d 517, 532 (6th Cir.

1994).  Furthermore, where the trial court determines that hours are excessive or

duplicative, it may make "a simple across-the-board reduction by a certain percentage."

*Hudson*, 130 F.3d at 1209 (approving an across-the-board reduction of 25% for

duplication of effort),[15] *citing Coulter*, 805 F.2d at 152 (approving a 50% across the

board reduction for certain items due to multiple representation as the danger of

duplication and wasted resources is difficult to measure); *see also Saint-Gobain*

---

billing records to be adequate where entries made by counsel "were sufficient even if the description for each entry was not explicitly detailed," *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005), and where the attorney provided the court with computerized calendars and file information indicating the dates and times of work performed. *Sigley v. Kuhn*, Nos. 98-3977/99-3531, 2000 WL 145187, 2000 U.S.App. LEXIS 1465 at *20-21 (6th Cir. Jan. 31, 2000); *see also Anderson v. Wilson*, 357 F.Supp.2d 991, 999 (E.D.Ky.2005) (holding that the Plaintiffs had satisfied their burden to provide sufficiently detailed billing records where counsel provided the court with "itemized statements describing the subject matter, the attorney, the time allotment, and the charge for all work done on Plaintiffs' case").

Imwalle, 515 F.3d at 553.

[15] *Hudson* was abrogated on other grounds by *Pollard v. E.I. du Pont Nemours & Co.*, 532 U.S. 843 (2001).

*Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 764-65 (N.D. Ohio 2010) (Lioi, J.) (finding that a 50% reduction in fees "is a fair and expeditious solution to determining the sum total of reasonable fees") (collecting cases).

Once a court has calculated the lodestar (*i.e.*, reasonable hours times a reasonable rate), the court may adjust the final fee award upwards or downwards and should consider the twelve factors identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Johnson*, 488 F.2d at 717-19.[16]  Each case is fact specific and there is no precise formula for determining fees.  *Hensley*, 461 U.S. at 436.  The most critical factor is the degree of success obtained.  *Id.*  However, there is a "strong presumption that the lodestar represents the reasonable fee."  *Burlington v. Dague*, 505 U.S. 557, 562 (1992).

The NVRA provides that, in addition to attorney's fees, a court may award "litigation expenses, and costs."  42 U.S.C. § 1973gg-9.  Such expenses typically include both (i) costs arising from representation and typically charged to a fee-paying

---

[16] In *Hensley*, 461 U.S. at 432, the Supreme Court recognized the 12 *Johnson* factors, but noted that these factors are usually subsumed within the calculation of reasonable hours at a reasonable rate.

client, such as travel, copying and expert witness fees, and (ii) those that are incurred

by a party and paid to a third party, not the attorney, such as filing fees and witness

attendance fees.  *See Northcross v. Bd. of Ed. of Memphis City Schs.*, 611 F.2d 624,

639 (6th Cir. 1979); *Project Vote*, 2009 WL 917737, at *19; *Disabled Patriots of Am.,

Inc. v. Odco Invs., Ltd.*, No. 04-cv-7399, 2009 WL 1767582, at *7 (N.D. Ohio June 23,

2009) (Katz, J.); *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 297, 299

n.1 (2006).

## II.  Analysis

A.  Complete Denial of Fees

Both the SOS and DJFS assert that the request for fees and costs should be

denied in its entirety because the claimed amount should shock the conscience of the

Court.

Defendants also have raised a number of concerns about the billing process in

general, along with questioning specific tasks and expenses:  (1) some entries are out

of order; (2) not all of the time, expenses or claimed rates submitted to this Court were

submitted to Plaintiffs' expert; (3) many of the hours are rounded to the nearest half

hour; (4) some entries reflect time spent in 2002 and 2003, more than 4 years before

the suit was filed; (5) there is some reason to question the authenticity of the billing

records and whether all of the time was contemporaneously recorded; (6) counsel billed

for attending a press conference, for traveling to Cleveland to file a complaint and for

spending a day outside DJFS offices soliciting clients; (7) there is a significant

discrepancy in the hourly rate Ms. James claimed in the *Project Vote* case in 2008

($200 per hour) and the rate she is claiming in this case ($450 per hour for work performed in 2008 and 2009) and this information was not provided in response to a discovery request; (8) lead counsel represented he would be applying for *pro hac vice* admission to this Court and proceeded to litigate for two years before filing such a petition and, in the meantime, Plaintiffs filed 3 unsigned pleadings in violation of Rule 11; (9) the records show support staff tasks being billed at attorney rates, such as attorney time for scheduling, scanning documents, organizing files, and booking travel arrangements; (10) the case was overstaffed and over-lawyered, with significant duplication, redundant billing, excessive conferencing and emails leading to time billed for unproductive and unnecessary tasks;[17] (11) the billing entries are generalized without reference to a particular subject matter or tasks, other than "reviewing," or "research," or "conference," to such an extent that Plaintiffs fail to meet their burden of showing the time was reasonable; and (12) there is a pattern of questionable expenses such as charges for overdue fines on books, the cost of certificates of good standing, billing for attendance at a seminar, hiring a paralegal for 4 days, and charges for meals, taxis, and overtime while in New York without any details connecting those charges to this case.  Defendants argue that all of this calls into question the integrity and validity of the fees and expenses to such an extent that the fees should be denied in their entirety.

---

[17] According to the calculations of the DJFS, "Plaintiffs have staffed this case as if the issue involved a multinational corporate merger.  They are asking for $53,166 in attorney fees and expenses to send seven out-of-town lawyers to a simple scheduling conference.  And they are asking for $620,628.50 in attorney fees just for their e-mails, phone calls, and meetings with each other." DJFS Mem. Opp'n 2, Doc. 114.

In their reply, Plaintiffs treat the request for a complete denial of fees as a frivolous assertion "that should not be tolerated by this court" and categorize the alleged ethical improprieties, overstaffing and over-lawyering as "reckless allegations." Plaintiffs emphasize the "stellar result" they achieved in this litigation and argue that they achieved a "ground-breaking" result in the Sixth Circuit, achieved a settlement agreement that resulted in mandatory, not voluntary, compliance with the NVRA, and, through the litigation, have fostered the actual and potential registration of "hundreds of thousands of low income Ohioans who visit DJFS offices every year."  They respond that they have expert testimony supporting the fees and contrast their evidence with the lack of evidence submitted by Defendants.

The complete denial of a fee request is an extreme action.  It is appropriate only in unconscionable and shocking situations, such as circumstances where the request is "grossly and intolerably exaggerated, manifestly filed in bad faith, or wholly undocumented."  *Project Vote*, 2009 WL 917737, at *8.  This Court does not view Defendants' argument for a complete denial of fees as frivolous as Defendants raise a number of valid concerns suggesting the fees and/or hours may be excessive and cite to a number of reasons that call into question a number of entries, billing judgment, duplication and staffing.  However, this Court cannot conclude that the fee request is intolerably exaggerated, filed in bad faith or wholly undocumented.

This is not a case where the plaintiffs have failed to submit any documentation. Notably, Plaintiffs have submitted an incredible volume of time sheets reflecting thousands of time entries.  There are affidavits of counsel who supervised and/or performed the work attesting that the work has been performed.  Plaintiffs also

submitted affidavits of two experts, both of whom were deposed by Defendants, in support of the fee request.  Moreover, Plaintiffs attained much of the relief sought in their complaint.  Although Defendants contest the degree of success attributable to Plaintiffs' continuation of the litigation after the Sixth Circuit rendered its opinion and after the DJFS filed an offer of judgment, there is no question that the litigation triggered a change in the way the State of Ohio registers voters and distributes voter information to low-income residents.  This is true regardless of the benefit inuring to the individual Plaintiffs and ACORN.  Finally, while some of the billing practices cited by Defendants may raise questions, Defendants have not established a fraud or deliberate falsehood in the fee request and have not met their burden of making a "strong showing" of special circumstances that justify denying an award of any fees.  *Deja Vu of Nashville, Inc.*, 421 F.3d at 422.

There is a presumption that counsel are entitled to fees under the NVRA.  The complete denial of fees would frustrate the purpose of the federal fee shifting statutes adopted by Congress to encourage private litigants to enforce the NVRA.  Although the magnitude of the fee request raises considerable questions, a reduction in fees is a better mechanism for dealing with Defendants' challenges than a complete denial of fees.  Thus, this Court concludes that Plaintiffs are entitled to a reasonable award of fees and costs.

B.  Reasonableness of Plaintiffs' Requested Award

Plaintiffs' request encompasses both fees and costs.  The Court will first address the reasonable amount of fees to be awarded and then will address the costs.  In addressing the amount of fees, the Court will first calculate the lodestar by multiplying

the reasonable hourly rate by the proven number of reasonably expended hours.  The

Court will then analyze whether an adjustment should be made in light of the *Johnson*

factors.  In determining the reasonableness of the award, this Court has reviewed and

considered all of the affidavits/declarations, depositions, time sheets and other

documents submitted, along with the arguments made by all counsel and this Court's

experience and knowledge of this case.

   1.  The Reasonable Hourly Rate:  Home v. Local Rates

   The first issue is whether Plaintiffs should be reimbursed at the "home" rates of

counsel, located in New York City, Boston and Washington D.C., or Cleveland rates.

The difference in these rates is substantial, as the "home" rates almost double the

Cleveland rates suggested by Plaintiffs.[18]  Plaintiffs claim they are entitled to "home"

rates because "there can be no doubt that few, if any, local lawyers have both the

knowledge in this highly complex and specialized area of the law and the resources to

litigate a case of this magnitude."  Pls.' Mem. Law 15, Doc. 90.  They further assert that

no local lawyer was willing to undertake an action of this magnitude.  *Id.*  Defendants

counter that Plaintiffs have failed to present evidence necessary to meet their burden of

establishing that there were no competent counsel available in the local market.

   The reasonable hourly rate is determined with reference to those rates prevailing

in the community for lawyers of comparable skills, experience and reputation.  *Blum*,

465 U.S. at 895.  The Sixth Circuit has held that the "prevailing market rate in the

---

[18]  After applying an "across the board" discount of 5% to both the "home" and
     Cleveland rates, Plaintiffs calculate totals of $2,716,016.74 and
     $1,485,455.67, respectively.

relevant community" is the rate commanded in the venue of the court of record.[19]

*Adcock-Ladd*, 227 F.3d at 350, *citing Hudson*, 130 F.3d at 1208.   Plaintiffs bear the

burden of proving the reasonableness of the hourly rate requested.  *Hensley,* 461 U.S.

at 433.

There is an exception to the general rule that the prevailing rates in the local

community establish the appropriate lodestar rate.  This exception exists when fees are

sought for an out-of-town specialist in areas "such as admiralty law, patent law, or

antitrust and other complex litigation."  *Chrapliwy v. Uniroyal*, 670 F.2d 760, 769 (7th

Cir. 1982); *Saint-Gobain Autover*, 707 F. Supp. 2d at 758-59 (recognizing an out-of-

town specialty rate for a patent lawyer and distinguishing such a case from a civil rights

case).  In determining whether out-of-town rates are to be awarded, courts must

consider:  "(1) whether hiring the out-of-town specialist was reasonable in the first

instance, and (2) whether the rates sought by the out-of-town specialist are reasonable

---

[19] The court in *Adcock-Ladd* stated:

> The Sixth Circuit has resolved that, when a counselor has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit, thereby necessitating  litigation by that lawyer primarily in the alien locale of the court in which the case is pending, the court should deem the "relevant community" for fee purposes to constitute the legal community within that court's territorial jurisdiction; thus the "prevailing market rate" is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices, at least where the lawyer's reasonable "home" rate exceeds the reasonable "local" charge.

*Adcock-Ladd*, 227 F.3d at 350 (internal citations omitted).

for an attorney of his or her degree of skill, experience, and reputation."  *Hadix v.*

*Johnson*, 65 F.3d 532, 535 (6th Cir. 1995).  "A corollary of this rule is that judges may

question the reasonableness of an out-of-town attorney's billing rate if there is reason to

believe that competent counsel was readily available locally at a lower charge or rate."

*Id.*  The party seeking out-of-town rates bears the initial burden of showing that it was

necessary to resort to an out-of-town specialist.  *Id.*  In support of such a claim, the

record should contain evidence that counsel made an "attempt to investigate the

availability of competent counsel in the local market."  *Id.*

Plaintiffs submit that they are entitled to their "home market" hourly rates for the

following reasons:  (1) the three public interest organizations involved in this action

focused on election litigation generally and the NVRA specifically; (2) no local lawyer

proved willing to undertake an action of this magnitude and litigate against state

officials; and (3) no local firm expressed a willingness to undertake "*pro bono*"

representation in this case.  In support, Plaintiffs claim that their expert, Mr. Kerger,

testified no Ohio lawyers, including himself, or law firms, with the possible exception of

the Porter Wright firm, would have undertaken this litigation on a *pro bono* basis.

According to Mr. Kerger, while some Ohio lawyers had the experience and may have

been willing to devote some time to the litigation, those larger firms that did have the

financial ability to do so would not have undertaken the representation due to ethical or

business conflicts, particularly considering the "politically sensitive" nature of the

allegations.  Similarly, Plaintiffs present the affidavit and deposition of Mr. Lambros

stating that he was unaware of any Ohio firm that would have undertaken this case

-30-

without being paid on an ongoing basis due to the size and complexity of the case and the potential ethical and/or business conflicts. Finally, Plaintiffs present the declaration of Mr. Greenbaum documenting the unsuccessful efforts of the Lawyers' Committee to find an Ohio firm to undertake the litigation.

Defendants argue that Plaintiffs have not presented any evidence that they made any attempt to investigate the availability of competent counsel in the local market, and that Mr. Kerger testified that there are lawyers in Cleveland and Columbus that handle election law cases and identified at least one lawyer, Donald McTigue, and two major or Ohio law firms, Porter Wright and Vorys Sater, that handle election litigation in Ohio. Defendants also present a list of recent Ohio cases involving election litigation brought by a number of solo practitioners and major law firms[20] to show that there are an ample number of Ohio lawyers capable of handling election cases.

Defendants' argument is well taken. Plaintiffs have not identified any actual efforts to contact lawyers to undertake this litigation, that is, they have not presented any evidence that they actually tried to obtain representation by Ohio lawyers and were refused. The declaration of Mr. Greenbaum falls woefully short of this. Mr. Greenbaum cites a history of his frustration in finding local counsel in other cases, and, with regard

---

[20] Defendants cite to the following cases: *Northeast Ohio Coalition of the Homeless v. Brunner,* 652 F. Supp. 2d 871 (S.D. Ohio 2009) (plaintiffs represented by Porter, Wright, Morris & Arthur and Carlisle, Patchen & Murphy); *Project Vote v. Blackwell*, No. 1:06-cv-1628, 2009 WL 917737 (N.D. Ohio Mar. 31, 2009) (plaintiffs represented by Donald McTigue of Columbus); *King Lincoln Bronzeville Neighborhood Ass'n v. Blackwell*, No. 2:06-cv-745, 2009 WL 633192 (S.D. Ohio Mar. 5, 2009) (plaintiffs represented by Clifford Arnebeck of Columbus, Robert Fitrakes of Columbus and Subodh Chandra of Cleveland).

to this specific case, merely states that he spoke

> to the Lawyers' Committee Pro Bono Counsel, who normally places [their] cases, about finding firm co-counsel in Ohio and, as [he] had expected, she was not able to identify anybody.  She eventually circulated this matter to board members and firms [the Lawyers' Committee] works with and Dechert LLP agreed to take on.

Greenbaum Supp. Decl. ¶ 5, Doc. 117-2.[21]  Moreover, Mr. Steiner was unable to

identify any Ohio lawyers who had been contacted and/or refused to undertake the

litigation.  Steiner Dep. 22:2-22, Doc. 97.

The statements and depositions of Mr. Lambros and Mr. Kerger are not

persuasive.  In his affidavit and declaration, Mr. Lambros reasons that (1) the economic

investment required by this case would have been prohibitive for all but the largest Ohio

firms; (2) no large Ohio firm would have undertaken this litigation because it would have

been unpopular with their firms and their clients; (3) such firms would undoubtedly have

conflicts of interest and would risk "damage to political and client relationships, and

adverse publicity which would make this case unpalatable"; and (4) Ohio firms do not

demonstrate the same level of commitment to *pro bono* activity as that shown by the

Dechert firm, as noted by a national ranking that places Dechert 4th and no Ohio firm

higher than 87th.  Lambros Aff. & Decl.  ¶ 21.B.vi *and* vii, Doc. 89-26.

Mr. Kerger's testimony on this point is not particularly relevant in so far as he

describes his personal reluctance to undertake *pro bono* cases where a party may be

---

[21] Mr. Greenbaum also assumed this case would take several years, thousands of hours in time and substantial advancement of out-of-pocket funds.  While this may have turned out to be a self-fulfilling prophecy, in this Court's view, as discussed later in this opinion, the magnitude of the time spent and costs expended are not reasonable; and while the start to finish of this suit may be years, there have not been years of active litigation.

awarded fees as a prevailing party.  Moreover, the opinion he renders is hardly

sufficient to satisfy Plaintiffs' initial burden of establishing that no local counsel would

take this case.  Mr. Kerger's testimony is that:  it is "unlikely" that major firms would

undertake the litigation because of potential conflicts, but he would "hate to speak on

behalf of all the firms in Ohio"; that he would be "stunned" if Mr. McTigue's firm would

undertake this litigation because of the size of his firm; and that Porter Wright "might"

have undertaken it.[22]   Kerger Dep. 58:6-61:9, Doc. 102.

_____

[22] Mr. Kerger's  testimony is as follows:

> Q. And are the election matters that you've handled, do some or all
> of those matters -- are some or all of those matters under provisions
> in which a prevailing party -- prevailing plaintiff might be entitled to
> attorneys' fees at the end of the litigation?
>
> A. Certainly some of them were. I don't know if all of them were.
>
> Q. And is it your practice to undertake elections litigation in the state
> of Ohio in the hope of obtaining a fee pursuant to a fee-shifting
> statute?
>
> A. No.
>
> Q. Could you explain what your general practice is in that regard?
>
> A. One, particularly for firms that are less than a thousand people, if
> you're going to have a substantial time commitment and at the end of
> it you're only going to get back your time or some small multiple
> increase, the time of the investment is not worth the risk.  I'll take a
> contingency-fee case, and I won't be bothered by putting 200,000 into
> it, even if it comes up empty, as long as I had a chance at a million
> dollars. If it's not a five- or six-fold return, it doesn't make sense to
> start it.
>
> Q. And are you aware of -- have any of your -- strike that.  Are you
> familiar with the NVRA?
>
> A. Yes.

Q. And prior to -- were you familiar with the NVRA prior to the 6th Circuit opinion in the Harkless case?

A. Sure.

Q. And are you aware of firms or attorneys in Ohio who would have undertaken litigation of the nature filed by the plaintiffs in this case under the NVRA in the hope of having an attorney's fee award under the fee-shifting statute at the end of the day?

A. I hate to speak on behalf of all firms in Ohio, but I would consider it unlikely, particularly with the major firms that would have the resources to do what they wish because of potential conflict.

Q. Is one of those firms the Vorys firm?

A. Yes.

Q. And do you believe that the Vorys firm -- if you have an opinion one way or the other, but do you have a belief as to whether the Vorys firm would have undertaken a litigation of this nature on behalf of plaintiffs in the hope that their attorneys' fees would be paid?

A. I would think it's unlikely, yes.

Q. And are you familiar with Mr. McTigue?

A. Yes, I am.

Q. Do you know whether Mr. McTigue would undertake a litigation of this nature without support or co-counsel from a major national law firm?

A. I would be stunned if he would. Again, just because of the size of his firm versus the amount of time you would have to expend.

Q. And do you know whether this is the type of case that the Porter Wright firm would have undertaken?

A. They have undertaken -- I can't remember what it was, Caroline worked on the one, and I don't know the nature of it. I don't know how much -- obviously, the larger firms have available time for pro bono, and depending on who the coordinator is and what else they've got

-34-

In this Court's opinion, the statements, affidavits and testimony of Messrs. Lambros, Kerger and Greenbaum do not establish the first prong of the test set forth in *Hadix*, that is, that hiring an out-of-state specialist in the first instance was reasonable. The record is devoid of actual efforts made in this case to contact any Ohio lawyer to undertake the representation.  The opinions that no firm would actually undertake the representation of this case, or join in the representation of this case, are speculative and lack any articulated and meaningful foundation.  This Court is not persuaded by the scant and conclusory evidence presented that Ohio lawyers lack the conviction to undertake unpopular causes or that they will refuse to take *pro bono* cases of some magnitude with the hope of obtaining fees as a prevailing party.  While the Dechert firm may be 4th in the country in undertaking *pro bono* cases, Ohio, nevertheless has at least one firm in top 100 nationally.  Moreover, the individuals supporting the claim that no Ohio firm would have undertaken this litigation assume as valid that the case required the number of hours, attorneys and expenditure of costs that Plaintiffs' counsel is requesting.  As discussed in the section pertaining to the reasonableness of hours and costs, this Court does not agree with that assumption.  Plaintiffs have failed to show that Ohio lawyers were incapable of handling issues presented in this case, which are not as complex as Plaintiffs allege and do not involve the kind of specialty that ordinarily is associated with the need for out-of-town counsel.  Finally, Plaintiffs have not

---

going on, you know, they might.  I've seen them in some capacity doing some work. I didn't know what the arrangement was.

-35-

demonstrated that they were particularly efficient and Ohio lawyers would have had to spend extra time to learn the law.  Accordingly, Plaintiffs have failed to present evidence necessary to meet their burden of establishing that there were no competent counsel available in the local market.

2.  The Reasonable Local Hourly Rate

As an alternative to its home rates in the event this Court found Cleveland rates should apply, Plaintiffs submitted proposed Cleveland rates, asserting that these rates should be commensurate with rates large law firms typically charge in significant and complex matters.  In support, Plaintiffs offer the opinions of Messrs. Lambros and Kerger and submit the fee applications for several Chapter 11 bankruptcy cases handled in the United States Bankruptcy Court for the Northern District of Ohio by the area's largest law firms for fee-paying clients.  Plaintiffs maintain that the minimum appropriate Cleveland hourly rate should be $450 per hour for attorneys with 15 years experience or more, $400 per hour for attorneys with 10 to 15 years of experience, $300 per hour for attorneys with five to 10 years of experience, $200 per hour for attorneys with less than five years of experience, and $100 per hour for paralegals. According to Plaintiffs, using proposed Cleveland rates, the lodestar calculation based upon the hours claimed would be $1,485,455.67.

Defendants counter that an election law case does not warrant the same fee structure as that requested in the most complicated commercial setting evidenced by the fee applications in the Chapter 11 bankruptcy cases.  As for the appropriate rate, they rely heavily upon reasoning in an election law fee case rendered in this district, *Project Vote v. Blackwell*, No. 1:06-cv-1628, 2009 WL 917737 (N.D. Ohio Mar. 31,

-36-

2009) (O'Malley, J.), and also cite to several alternative rates suggested in a case law study conducted by the Ohio State Bar Association ("OSBA") titled "Economics of Law Practice in Ohio" ("OSBA report")[23] published in 2007,[24] which Judge O'Malley referenced in *Project Vote*.  The OSBA report suggests the *average*[25] hourly rate is $195 per hour for attorneys with 11 to 15 years of experience (the years of experience for Neil Steiner and Lisa Danetz, lead counsel in this case), and $177 per hour for attorneys with six to 10 years of experience.  The 95th percentile of billing rates for lawyers with 11 to 15 years of experience is $330 per hour according to the OSBA report.  As an additional argument that the Cleveland rates proposed by Plaintiffs are too high, Defendants note that the Plaintiffs' own expert, Richard Kerger, an election law specialist who has been practicing law for 36 years, bills at a rate of $330 per hour. *See* Kerger Dep. 40:18-19, Doc. 102.  Defendants vigorously contest the billing rate proposed by Theresa James, who is requesting a rate of $450 per hour in this case, because she asked for, and received, a rate of $200 in the *Project Vote* case and has not articulated why her billing rate more than doubled in one year.

---

[23] This document can be downloaded at http://downloads.ohiobar.org/memrsrc/ membn/pracrsrc/2007EoLS.pdf.   A copy is attached to the affidavit of Henry Appel as Exhibit R.  *See* Doc.108-8.

[24] Although this report was issued in 2007, Defendants claim it remains relevant and appropriate because Plaintiffs' expert, Richard Kerger, noted that his own rates have remained the same since 2006, which suggests that rates have not changed since 2007.  *See* Kerger Dep. 40:18-19, Doc. 102.

[25] The median rates are slightly lower.

Following is a copy of a chart submitted by Defendants[26] that applies the rates

determined by Judge O'Malley in the *Project Vote* case and indicates, among other

things, that an appropriate rate for attorneys with 11 to 15 years of experience is $340

per hour.

| Attorney | Bar Admission | Requested Home Rate | Requested Cleveland Rate | Rates Applied in Project Vote |
|---|---|---|---|---|
| **Dechert** | | | | |
| Steiner | 1997 | $725 | $400 | $340 |
| Penchansky | 1998 | 315 | 100 | 125 |
| Topp | 2000 | 590 | 300 | 175 |
| Singh | 2002 | 375 | 100 | 125 |
| Gardner | 2004 | 490 | 200 | 150 |
| Gibbs | 2004 | 335 | 100 | 125 |
| Orzea | 2004 | 335 | 100 | 125 |
| Gibson | 2005 | 490 | 200 | 125 |
| Brereton | 2007 | 390 | 200 | 125 |
| Powell | n/a | 240 | 100 | 70 |

---

[26] Defendants challenge the Boston rates for the DEMOS attorneys based upon a First Circuit case that has concluded "the typical rate for leading civil rights attorneys in the Boston area ranges from $200 to $350 per hour."  *United States v. One Star Class Sloop Sailboat*, 546 F.3d 26, 41 (1st Cir. 2008).  This is substantially less than $800/hour and $700/hour rates Plaintiffs claim for Boston area attorneys.  Defendants also apply a 2004 rate for Ms. Chapman as she was not admitted to the bar until 2004, although she graduated in 2002, and apply a paralegal or law student rate for Ms. Gershon and Mr. Dupre as neither were admitted to the bar until after s/he completed work in this case.

**DEMOS**:

| | | | | |
|---|---|---|---|---|
| Wright | 1982 | 800 | 450 | 340 |
| Danetz | 1996 | 700 | 400 | 175 |
| Chapman | 2004 | 550 | 300 | 170 |
| Gershon | 2009 | 350 | 200 | 70 |
| Novakowski | n/a | 200 | 100 | 70 |
| Sloman | n/a | 200 | 100 | 70 |

**Lawyers' Committee:**

| | | | | |
|---|---|---|---|---|
| Greenbaum | 1993 | 800 | 450 | 340 |
| Kengle | 1984 | 800 | 450 | 200 |
| Blustein | 1987 | 800 | 450 | 200 |
| Dupre | 2009 | 350 | 125 | 70 |

**Project Vote**

| | | | | |
|---|---|---|---|---|
| James | 1981 | 450 | 450 | 200 |
| Mellor | 1983 | 800 | 450 | 200 |
| Kovite | 2006 | 450 | 300 | 125 |
| Wine | 2007 | 375 | 200 | 125 |
| Savitzky | n/a | 200 | 100 | 70 |

In their reply, Plaintiffs counter that there is no basis for this Court to adopt the proposed rate structure suggested by Defendants because (1) Defendants did not offer the testimony or expert opinion of any Ohio attorney to contradict the expert opinions

submitted by Plaintiffs; (2) there is no reason to adopt the suggested rates applied by

Judge O'Malley; (3) this Court should not reduce the rates simply because it is a civil

rights case or was undertaken *pro bono*; and (4) the OSBA rates applied by Defendants

are for the "greater Cleveland" area as opposed to "downtown Cleveland."  They also

offer specific challenges to Defendants' proposed rates for two DEMOS attorneys

(Brenda Wright and Lisa Danetz) and three Lawyers' Committee attorneys (John

Greenbaum, Robert Kengle and Benjamin Blustein), as quoted below:

> Specifically, Defendants erroneously suggest a rate of $175 per hour for Ms.
> Danetz, even though she graduated from law school the same year as Ms.
> Weiser, who was awarded a rate of $310 per hour in *Project Vote,* and like
> Ms. Weiser works for a prestigious public interest organization.  Similarly,
> Defendants propose a rate of $340 per hour for Ms. Wright and Mr.
> Greenbaum and with no explanation a rate $200 per hour for Mr. Kengle and
> Mr. Blustein, even though each of those attorneys has 17 to 28 years of
> experience litigating voting rights cases and should be viewed comparably
> to the senior attorneys in the *Project Vote* action, who were awarded $450
> per hour (indeed, even if the $400 per hour rate of Mr. McTigue were used,
> Defendants' calculations would be too low).  Using rates of $310 per hour for
> Ms. Danetz and $450 per hour for Ms. Wright and Messrs. Greenbaum,
> Kengle and Blustein, and the rates proposed by Defendants for the other
> attorneys and paralegals (and applying the 5% reduction) yields a lodestar
> calculation of $1,108,483.76 ($467,259.40 for Dechert; $365,591.83 for
> Demos; $218,526.60 for Lawyers' Committee; and $57,105.93 for Project
> Vote).

Pls.' Reply 20, Doc. 117.

Plaintiffs bear the burden of establishing that the requested rates are "in line with

those prevailing in the community for similar services by lawyers of reasonably

comparable skill, experience and reputation."  *Blum*, 465 U.S. at 896 n.11.  After

considering all of the evidence and arguments presented in this case, this Court

concludes that Plaintiffs have failed to meet that burden here.  In reaching this

conclusion, this Court has considered the opinions of other courts, relied upon its own

experience and knowledge of this case, and reviewed and considered the declarations/affidavits, exhibits, depositions and arguments submitted in this case.

Initially, Plaintiffs support their proposed Cleveland rate by reference to fees charged to paying clients by the largest Ohio firms involved in corporate reorganizations under Chapter 11 bankruptcy litigation.  There is no explanation as to why these rates are in line with those prevailing in the community for the type of services rendered in this case, other than the cursory statement that "these rates are comparable to rates charged by prominent law firms in the most complex and challenging matters they handle for fee-paying clients."  Pls.' Mem. Law 16, Doc. 90.  The fee ranges submitted in these bankruptcy cases have minimum rates of $155, $165, $210, $218 and $180 per hour for associates to maximum rates of $995, $475, $775, $485 and $625 per hour for partners.

Although this Court gives some weight to the opinions of Messrs. Kerger and Lambros offered in support of Plaintiffs' fee request, it does not give those opinions controlling weight and, ultimately, is not persuaded by the conclusions.  Mr. Kerger merely opines that the rates ranging from $450 per hour for attorneys with 15 or more years of experience to $200 per hour for attorneys with 5 years or less experience, considering the type of litigation involved in this lawsuit, are reasonable rates for Cleveland lawyers.  He found the paralegal rates of $100 per hour to be on the high end, but nevertheless consistent with the charges made in the Cleveland area for experienced paralegals.  Kerger Aff. ¶ 4, Doc. 89-25.  There is no further explanation for his conclusion in his affidavit and no review of comparable cases or fees actually charged.  His deposition reflects that he focused simply on the high and low  years of

-41-

practice and the high and low range of rates being charged, after being presented with the ranges in an email and a minute-and-a-half conversation with Brenda Wright. Kerger Dep. at 6:7-7:24, Doc. 102.  He did not focus on the other rates being charged or qualifications of the individual lawyers seeking fee reimbursement.  *Id.*  Mr. Kerger, who has more than 30 years of experience, has an hourly rate of $330 per hour, but noted that Cleveland rates are about 1/3 higher than Toledo rates and that rates have not changed since 2006.  *Id.* at 8:22-9:4, 40:18-19.

Mr. Lambros concludes that both the "home" and Cleveland rates requested are reasonable and further opines that the rates of large urban firms are an appropriate measure because the rates of medium and small firms are not adequate to attract competent counsel.  Lambros Aff. & Decl. ¶ 21.B.iv-v, Doc. No. 89-26.  There is no factual basis supporting this statement—it is merely conclusory.  He further states that because the Dechert firm is engaged in sophisticated securities and commercial litigation on a national level and its rates are paid by fee-paying clients, the "home rates" are reasonable in this case.  He presents no logical connection for a conclusion that  "sophisticated securities and commercial litigation" and election law are similar areas of practice that should command the same rates.  Nor does he discuss the rates of the public interest lawyers who are not being paid by fee-paying clients.

Aspects of Mr. Lambros's deposition are troubling.  He proceeds at length to discuss the fees in this case in a political context, attributes much of the "complexity" to the opposition to the case by Secretary of State Kenneth Blackwell,[27] and offers no

---

[27]  Mr. Lambros ignores the fact that while this case was pending on appeal, Jennifer Brunner substituted as Secretary of State for Kenneth Blackwell.

reasonable clarity as to why this case is complex and should command abnormally high

billing rates,[28] other than perhaps the fact that there are 88 counties in Ohio.

_____

Lambros Dep. at 19-22, 57, 65-66.

[28] Mr. Lambros's  testimony on this point follows:

> Then, it became obvious to me that we do have complexity here,
> complexity with the political factor of Kenneth Blackwell, the Secretary
> of State, who was, as we can take virtual judicial notice of, the
> co-campaign manager of the Bush versus Kerry campaign of 2004.
> And while Attorney General -- well, the Secretary of State is now a
> candidate --republican candidate for governor in 2006.  Then, you
> start thinking of the 4.7 million applicants and then take a look at the
> National Voter Registration Act, which -- Congress was concerned
> with enhancing the number of people eligible for voting and that these
> eligible voters -- these eligible voters, being predominantly poor, then
> you begin to take a look at, perhaps that may be the reason why
> Kenneth Blackwell wants to keep these people from the polls and may
> not be implementing the requirements of the National Voter
> Registration Act.  Then, you begin to see complexity built into it.  I'm
> trying to get a sense and understanding of the billing statement as to
> what this whole dynamic, which, obviously, now from -- falls into my
> definition, among other things, of a complex case, multifaceted,
> polycentric.  Polycentric in the fact that you've got 88 offices and 88
> different people in charge of each of these offices and yet the
> National Voter Registration Act wants to have somebody in charge to
> put this all together and to bring about coordination and enforcement.
> Then, you take a look at the Sixth Circuit opinion which talks about
> coordination and builds into the coordination because they made it
> real clear in the footnote of James Madison's quote at the
> Constitutional Convention.  Article 1, Section 4, gives plenary power
> to Congress to deal with federal elections.  And this was a federal
> election that Congress was concerned with.  That dynamic begins to
> get very clear because I was concerned.  And it's all going back now.
> The relevance of what I'm talking about, in my own mind, was the
> people working.  Because I'm being called upon, from my
> conversations with Mr. Steiner, to take a look at the documents and
> the papers and to come up with an opinion as to fairness,
> reasonableness and  propriety of fees.  And there's a lot of people.
> What are they doing?  And all of a sudden it becomes clear to me,
> you need these people.  You need these people because you have
> 88 counties, 88 offices at which public assistance applications are

Furthermore, he takes a very broad-brushed approach to the fees and rates; he

describes himself as not being a "nitpicker"; and he renders his opinions under the

"totality of the circumstances."  Lambros Dep. 76:12-18, Doc. No. 111.  He does not

analyze, in any meaningful way,  the actual legal issues involved in terms of their

complexity.  Nor does he provide any analysis of the varying levels of experience and

the appropriate rates for the individual attorneys.

This Court has reviewed all of the filings and documents related to this case in

this Court and in the Sixth Circuit.  This Court agrees with Defendants that the legal

analysis in this case was not particularly complex.  The first phase involved discreet

legal issues, namely, whether ACORN had standing to bring the suit, and whether the

SOS and Director of the DJFS were proper parties to the suit.  *See Harkless*, 545 F.3d

at 445.  Although the interpretation of the NVRA was a case of first impression in Ohio

and the Sixth Circuit, it was not entirely unique or novel as a similar issue involving the

---

being processed and -- but were they trying to process these things
in a manner in which these people are given opportunity to fill out a
registration form which goes to 88 county Board of Elections? There's
where the Secretary of State comes in. So what I'm trying to do is
draw a picture in my own mind of the complexity of this whole
dynamic, which brings into play the various people and how they
come into play.  It then took me back to the Roadway case where we
had to come up with hiring manuals all over the country for the
trucking industry and how it was important to get there and teach and
train and begin to figure out how all of this work was being required.
So these are the types of things I'm asking Mr. Steiner to try to get a
sense of where everything fits in, so I can have a better
comprehension and understanding of it.  That's essentially the type
of questions I was asking him.

Lambros Dep. 20:20-23:22, Doc. 111.

NVRA already had been briefed and advanced in the State of Missouri.[29]  *See United States v. Missouri*, No. 05-4391-CV-C-NKL, 2006 WL 1446356 (W.D. Mo. May 23, 2006), *rev'd by United States v. Missouri*, 535 F.3d 844, 852 (8th Cir.2008).  Moreover, there is no evidence before this Court that election law, while "a difficult and worthy field," is one "known to command abnormally high billing rates."  *Project Vote*, 2009 WL 917737, at *12.

As Plaintiffs have not met their burden of persuading this Court that their proposed Cleveland rates are reasonable, this Court must consider other information in determining a reasonable rate.  Plaintiffs are not entitled to their requested rates simply because Defendants have not presented expert testimony contradicting Plaintiffs' experts.  In determining the appropriate rate, this Court is mindful that:  a reasonable rate is "one which will attract qualified and competent counsel but will not produce a windfall to the attorneys," *Northcross*, 611 F.2d at 638; the statutes use the term "reasonable" fees, not "liberal" fees, *Coulter*, 805 F.2d at 149; and reasonable fees are different from the "prices charged to well-to-do clients by the most noted lawyers and renowned firms in the region," *id*.

A starting point for determining reasonable rates is the rate actually charged by

---

[29]  Plaintiffs counsel in this case should have had access to the briefs in the Missouri case while litigating this case.  Plaintiffs initiated suit in this case on September 21, 2006, and filed their (unsigned) response to the motion to dismiss on November 17, 2006.  Plaintiffs filed their initial appellate brief in the Sixth Circuit on November 7, 2007, and their final and reply briefs on February 19, 2008.  The district court in the Missouri case filed it decision on May 23, 2006.  On appeal, the United States filed its initial brief in the Eighth Circuit on July 27, 2007, and a reply on October 19, 2007.  The Eighth Circuit reversed the lower court on July 29, 2008.

counsel for fee-paying clients for similar services.  In this case, there are no such

figures as only the lawyers from the Dechert firm, and possibly Mr. Bluestein,[30] appear

to engage in work for fee-paying clients, while the other lawyers work for public interest

organizations and do not generally bill clients for their legal services.  *See, e.g.*, Danetz

Decl. ¶ 9, Doc. 89-12; Greenbaum Decl. ¶ 8, Doc. 89-21.  But, Dechert is a firm

engaged primarily in securities and commercial litigation, and the Dechert lawyers do

not usually practice in Ohio.  Thus, no counsel engage in elections law work for fee-

paying clients in Ohio and this Court must consider benchmarks other than the precise

rates charged by the Dechert firm.  The rates charged by Ohio lawyers, in general, and

the rates approved in other election law cases are a reasonable bench mark for the

appropriate fees in this case.

The Law Firm Billing Rates and Billing Practices section of the OSBA report is

set forth below:

---

[30] Mr. Greenbaum declared that Mr. Blumstein's current hourly rate was $435
per hour, but it is not clear if that is his Washington D.C., Illinois, or Cleveland
rate.  Greenbaum Decl. ¶16, Doc. 89-21.

**Exhibit 21**

# 2007 HOURLY BILLING RATES BY FIRM SIZE, YEARS IN PRACTICE AND OFFICE LOCATION

---------------------------- Value by Percentile ----------------------------

| Size of Firm | N | Mean | 25th | Median | 75th | 95th |
|---|---|---|---|---|---|---|
| 1 | 312 | $173 | $146 | $175 | $200 | $250 |
| 2 | 102 | 190 | 150 | 175 | 236 | 300 |
| 3-6 | 158 | 195 | 150 | 190 | 225 | 300 |
| 7-10 | 80 | 187 | 150 | 175 | 210 | 274 |
| 11-20 | 48 | 206 | 150 | 195 | 250 | 330 |
| 21-50 | 66 | 217 | 163 | 218 | 250 | 325 |
| 51+ | 98 | 273 | 200 | 250 | 346 | 446 |
| **Years in Practice** | | | | | | |
| 5 or less | 115 | $156 | $125 | $150 | $175 | $205 |
| 6-10 | 120 | 177 | 150 | 175 | 200 | 250 |
| 11-15 | 99 | 195 | 150 | 175 | 225 | 330 |
| 16-25 | 220 | 198 | 150 | 185 | 244 | 324 |
| More than 25 | 316 | 219 | 171 | 200 | 250 | 375 |
| **Office Location** | | | | | | |
| Greater Cleveland | 156 | $218 | $160 | $200 | $250 | $360 |
| Greater Cincinnati | 106 | 217 | 175 | 200 | 250 | 366 |
| Greater Columbus | 197 | 218 | 160 | 200 | 250 | 386 |
| Greater Dayton | 54 | 188 | 150 | 185 | 225 | 291 |
| Northeast Region | 147 | 176 | 150 | 175 | 200 | 300 |
| Northwest Region | 98 | 165 | 125 | 150 | 196 | 250 |
| Southern Region | 112 | 169 | 150 | 168 | 200 | 255 |
| Downtown Cleveland | 81 | $237 | $175 | $225 | $288 | $389 |
| Suburban Cleveland | 75 | 197 | 150 | 175 | 225 | 350 |
| Downtown Cincinnati | 72 | 233 | 200 | 223 | 258 | 377 |
| Suburban Cincinnati | 34 | 183 | 158 | 180 | 200 | 243 |
| Downtown Columbus | 120 | 237 | 175 | 213 | 289 | 424 |
| Suburban Columbus | 77 | 188 | 150 | 185 | 223 | 276 |
| Dayton | 43 | 193 | 160 | 175 | 210 | 316 |
| Canton | 14 | 179 | 125 | 188 | 220 | 235 |
| Akron | 54 | 188 | 150 | 185 | 225 | 291 |
| Toledo | 49 | 188 | 150 | 180 | 225 | 273 |

Doc. 108-8.  The OSBA report notes three discrete factors in determining rates:  firm size, years of practice and office location.  The report indicates rates based on these factors separately and does not correlate them with one another, that is, the report does not distinguish rates in the Greater Cleveland area and downtown Cleveland based on firm size or years of experience.  However, as the parties acknowledge, a significant basis for differentiating rates is years of practice.  Although there is a considerable jump in rates for *firms* with over 50 attorneys,[31] there is only a modest difference in rates for individual attorneys in downtown Cleveland as compared to the Greater Cleveland area.[32]  As the rates proposed by Defendants for lawyers with more than ten years of experience assume Plaintiffs' counsel should be compensated commensurate with the rates in the 95th percentile of all Ohio lawyers, this assumption greatly benefits Plaintiffs and more than adjusts for the differences in the downtown Cleveland and Greater Cleveland area markets.

Plaintiffs' objection to the rates proposed for Ms. Danetz, Mr. Kengle and Mr. Blustein is well-taken.  Their suggestion that Ms. Danetz should be awarded a rate of $310 per hour is reasonable, given the rates in the OSBA report, the rates approved in *Project Vote* and the other rates proposed by Defendants.  The appropriate rates for

[31] While it appears Dechert is a large firm, there is little information about the size of the other legal organizations.  The resume of Brenda Wright, Director of DEMOS, states that she "supervises seven attorneys and researchers" and is a member of "management team for [an] organization with 40 staff and four affiliate organizations."

[32] For example, the difference between the rate for an attorney in the 95th percentile in downtown Cleveland as compared to an attorney in the 95th percentile in the Greater Cleveland area is $29.

-48-

Messrs. Kengle and Blustein are more problematic.  While these two lawyers have

between 19 and 26 years of experience and the $200 figure suggested by Defendants

is too low, these lawyers were supervised by Mr. Greenbaum, Greenbaum Decl. ¶ 2,

Doc. 89-21, who, in accordance with the OSBA report and the rates for other attorneys

in this case, commands a rate of $340.  Messrs. Kengle and Blustein should not be

compensated at a rate that is higher than their supervisor; but, given their experience

and the rates commanded in the 95th percentile of all lawyers in Ohio, a rate of $340 per

hour—a rate equal to Mr. Greenbaum's rate—is reasonable.  Accordingly, the Court

finds that Messrs. Kengle and Blustein should be compensated at the rate of $340 per

hour.[33]

The rates proposed by Defendants with regard to young associates, interns and

paralegals are reasonable and follow Judge O'Malley's findings in *Project Vote*.[34]

Those rates will be adopted here.[35]  In addition, Ms. James from *Project Vote*, who has

---

[33] These rates give considerable benefit to Plaintiffs' counsel as these rates are only slightly below the $375 rate for lawyers in the 95th percentile with more than 25 years of practice and are slightly higher than the $324 rate for lawyers in the 95th percentile with 16-25 years of practice.  The Court rejects the suggestion that either the rate of Mr. McTigue ($400.00 per hour) or the rates of Messrs. Bauer and Sandstrom ($450 per hour) in the *Project Vote* case should be applied here, particularly since those rates are considerably higher than the OSBA report and Plaintiffs' expert, Mr. Kerger, has 36 years of practice and commands a rate of $330 per hour.

[34] The rate approved for paralegals is higher than the $40 rate DEMOS expensed for a contract paralegal.  *See* Danetz Decl. ¶ 8 and attachment related thereto.

[35] Notably, some of these rates approved in *Project Vote* are higher than those Cleveland rates originally suggested by Plaintiffs.  *See, e.g.*, the rates for attorneys Singh, Penchansky, Gibbs, Orzea.  Nevertheless, this Court will apply the *Project Vote* rates for these associates, interns and paralegals.

more experience than her colleague, Brian Mellor, submitted an affidavit in the *Project Vote* case seeking compensation at a rate of $200 per hour in 2008. There is no explanation as to why her rate has doubled for this case. And while this Court will give Plaintiffs the benefit of the doubt and assume that Plaintiffs' non-production of this information in discovery was the result of a misunderstanding, the $200 rate will be applied here to both Ms. James and her colleague, Mr. Mellor.

Multiplying the hours claimed by the rates approved, would result in fee of $1,098,069, without including the 5% reduction proposed by Plaintiffs.

| DECHERT | | | |
|---|---|---|---|
| PERSON / BAR ADMISSION | HOURS | RATE | TOTAL |
| Neil A. Steiner / 1997 | 732.8 | $340 | $249,152.00 |
| Robert W. Topp / 2000 | 929.2 | $175 | $162,610.00 |
| Elliot M. Gardner / 2004 | 199.4 | $150 | $29,910.00 |
| William Gibson / 2005 | 173.9 | $125 | $21,737.50 |
| Kira N. Brereton / 2007 | 64.6 | $125 | $8,075.00 |
| Mimi P. Singh / 2002 | 26.3 | $125 | $3,287.50 |
| Timothy C. Gibbs / 2004 | 31.5 | $125 | $3,937.50 |
| Paul M. Orzea / 2004 | 25.5 | $125 | $3,187.50 |
| Marc L. Penchansky / 1998 | 20.4 | $125 | $2,550.00 |
| Bernard G. Powell / N/A | 177.0 | $70 | $12,390.00 |
| SUB TOTAL | 2,380.60 | | $496,837.00 |
| | | | |
| DEMOS | | | |
| PERSON / BAR ADMISSION | HOURS | RATE | TOTAL |
| Brenda Wright / 1982 | 170.70 | $340 | $58,038.00 |

| PERSON / BAR ADMISSION | HOURS | RATE | TOTAL |
|---|---|---|---|
| Lisa Danetz / 1996 | 741.10 | $310 | $229,741.00 |
| Alegra Chapman / 2004 | 301.00 | $170 | $51,170.00 |
| Susan Gershon / 2009 | 76.90 | $70 | $5,383.00 |
| Scott Novakowski / N/A | 137.85 | $70 | $9,649.50 |
| Oliver Sloman / N/A | 172.50 | $70 | $12,075.00 |
| SUB TOTAL | 1,600.05 | | $366,056.50 |
| | | | |
| LAWYERS' COMMITTEE | | | |
| PERSON / BAR ADMISSION | HOURS | RATE | TOTAL |
| Jon Greenbaum / 1993 | 69.2 | $340 | $23,528.00 |
| Robert Kengle / 1984 | 416.5 | $340 | $141,610.00 |
| Benjamin Blustein / 1987 | 14.7 | $340 | $4,998.00 |
| Phil Dupre / 2009 | 70.4 | $70 | $4,928.00 |
| SUB TOTAL | 570.8 | | $175,064.00 |
| | | | |
| PROJECT VOTE | | | |
| PERSON / BAR ADMISSION | HOURS | RATE | TOTAL |
| Nicole Kovite / 2006 | 83.8 | $125 | $10,475.00 |
| Teresa James / 1981 | 202.3 | $200 | $40,460.00 |
| Brian Mellor / 1983 | 14.45 | $200 | $2,890.00 |
| Donald Wine / 2007 | 21.9 | $125 | $2,737.50 |
| Ari Savitzky / N/A | 50.7 | $70 | $3,549.00 |
| SUB TOTAL | 373.15 | | $60,111.50 |
| TOTAL | 4,924.60 | | $1,098,069.00 |
| | | | |

3.  The Reasonable Hours Expended

Defendants object to the number of hours billed on several grounds.  Initially,

they challenge the authenticity of the bills because some of the times are out of order,

are rounded to the nearest half hour and/or hour, at times appear rewritten, and Mr.

Lambros did not review all of the billing entries submitted to the Court.  While these

factors may raise some questions, Defendants develop no further arguments or

evidence that would lead this Court to question the integrity of the billing or to conclude

that the work was not actually performed.

Defendants assert that Plaintiffs failed to exercise reasonable billing judgment,

which includes questions of whether counsel spent too much time on particular tasks,

"over-lawyered" or unnecessarily duplicated the work of co-counsel, and inappropriately

billed for particular items.  Defendants allege that  a committee of lawyers with a policy

agenda caused unreasonably high fees in this case, and that the fees would have been

much lower if the case had been approached as litigation on behalf of discreet clients.

Other than pointing out that they, in fact, had specific clients, Plaintiffs do not

explain to this Court's satisfaction the need for the number of lawyers working on this

case, or why the work required the work of four separate litigation entities.  While they

claim six lawyers performed the bulk of the work,[36] they do not describe the discrete

roles, if any, played by the multitude of lawyers or organizations that were involved in

this case; nor is there any cogent explanation as to how the participation of so many

lawyers maximized efficiency.  This case did not involve motions for summary

---

[36]  The time charts show, however, that more than 11 individuals billed for over
150 hours each.

judgment, a trial, or any evidentiary hearings.  It was not a class action.  The discovery period was relatively brief, and the DJFS made major concessions in its proposed stipulation and offer of judgment.  As a practical matter, after the remand from the Sixth Circuit and the concessions proposed in the offer of judgment, the principal issue (if not the sole issue) in this case was the remedy (and attorney's fees). The time period for which this case was under active litigation was relatively brief.  It was not on an expedited schedule.  On its face, the expenditure of almost 5,000 hours of time in a case that had discrete issues on appeal, included only 6 months of discovery and four settlement conferences is a bit mind-boggling.

The Court has considered, but for reasons previously mentioned, is not persuaded by the opinion of Mr. Lambros, which concludes not only that the hours expended are reasonable, but that a multiplier should be used because outstanding results were achieved.  This Court has meticulously and thoroughly reviewed every billing record and exhibit submitted.  A few things are strikingly clear from this review, and are noted below.

 One is that Plaintiffs' counsel spent an incredible amount of time emailing, conferencing, meeting, consulting and developing strategy.  Even a cursory review of the Dechert billing reveals this.  This number is multiplied exponentially after one reviews the time sheets for the other three organizations.  The sheer number of conferences and meetings is identified by Defendants as totaling $620,628.50, presumably based upon the "home" rates Plaintiffs requested, which total $2,716,016.76 (with a 5% reduction, and $2,851,817.57 without a 5% reduction).  DJFS Mem. Opp'n 2, Doc. 114.  Simple calculations reveal that the time meeting and

conferring represents about 22% of the fees billed at the "home" rates.[37]  It is doubtful that any fee paying client would pay for this degree of conferencing among the lawyers, paralegals and assistants.

Another aspect of the fees that is readily apparent from the time sheets and declarations is that multiple senior lawyers reviewed every pleading and document filed in this case and in the Sixth Circuit, as well as outlines, letters, discussion points and settlement proposals.  The SOS cites to a number of troubling entries.  SOS Mem. Opp'n 20-26, Doc. 109.  While it is quite understandable that Mr. Steiner and Ms. Dechert would review the work of Mr. Topp or other junior lawyers, there is no apparent reason why Ms. Wright, Mr. Kengle, Mr. Greenbaum, Ms. James and Ms. Kovite should be reviewing and approving materials that already had been reviewed, and usually already edited, by Mr. Steiner and Ms. Dechert.  Mr. Steiner and Ms. Dechert were lead counsel in this case and represent that they have extensive experience.  The duplication in this regard is extensive.

There is additional "over-lawyering" in this case with regard to travel and appearances.  The most striking examples are the travel and attendance at settlement conferences of at least four senior litigators on at least three occasions.  In the settlement conferences before this Court, there was no client participation at the request of Plaintiffs.[38]  The Court did require the attendance of persons with full

---

[37]  The actual calculations reflect that this is 21.7% of all hours billed at the "home" rates, and approximately 23% of all hours (less the 5% reduction) claimed at the "home" rates.

[38]  One of the individual Plaintiffs, at the Court's insistence, attended the August settlement conference, but did not participate, was not consulted and, due to

settlement authority.  But it is not at all clear why these conferences required lawyers in addition to the lead counsel.  The presence of so many lawyers and the lack of client input gives some credence to the Defendants' allegation that this case was not litigation on behalf of discreet clients, but rather as a suit conceived by public policy experts.[39]

Another troubling issue is the billing for non-compensable items and/or billing for extravagant and unnecessary items.  Included in this are such items as:  two senior lawyers traveling to Cleveland to file the complaint and hold a press conference; a senior lawyer billing for spending a day outside of DJFS offices to recruit and interview potential clients; an experienced lawyer holding two moot court arguments in preparation for a Sixth Circuit argument before senior lawyers who spent time not only preparing for the case, but also traveling to New York from Washington and/or Boston; two lawyers traveling to the Sixth Circuit two days before the oral argument in order to observe the circuit judges on the panel in this case; and a lawyer's attendance at a seminar.

With regard to other hours billed, Defendants argue that Plaintiffs unnecessarily expanded the scope of this litigation by conducting discovery in all 88 Ohio counties, particularly when ACORN only conducted voter registration in six counties and the two individual Plaintiffs resided in Lorain and Cuyahoga County, respectively.  Defendants also argue that such discovery was unnecessary because, prior to the taking of any

---

her lack of participation and clear lack of interest, was excused from future settlement conferences.

[39] Noticeably absent from the billing records are any significant number of communications with clients.

depositions, the DJFS offered to stipulate that until the Sixth Circuit issued its decision in October 2008, the DJFS had not attempted to force county agencies to comply with the NVRA; and, many of the hours Plaintiffs expended in discovery related to the DJFS's noncompliance with the NVRA prior to the Sixth Circuit's Decision.  DJFS Mem. Opp'n 26, Doc. 114.  Defendants also argue that the breadth of discovery into all 88 counties shows the litigation was not approached on behalf of the individual Plaintiffs, but was a policy directed litigation without any regard for fees.

This Court agrees.  Plaintiffs have not articulated why this discovery was necessary to the litigation, why similar information could not have been obtained in a more efficient way or how the magnitude of the discovery benefitted their clients.  The expansion of this litigation into discovery of all 88 counties resulted in significant and unnecessary fees for document review and cataloguing, and for depositions.  It is difficult to imagine that any fee-paying client would pay for such an effort.[40]

Another significant area that requires a reduction in hours is travel.  In this case, Plaintiffs have not met their burden of demonstrating that it was necessary to retain out-of-state counsel and that no Ohio lawyer(s) could undertake all, or even part, of the litigation.  Multiple lawyers traveled to Ohio on several occasions.  Most of this travel time should not be compensated.  For the most part, only the travel to the Sixth Circuit and the travel throughout Ohio on case-related matters would have been billed if local

---

[40] Even assuming that the activities of counties other than those in which the individuals resided, and in which ACORN conducted voter registration activities, were pertinent to this litigation, there were certainly more efficient ways to obtain relevant information, such as sampling a representative number of counties.

lawyers would have undertaken this litigation.

In addition, hours for three lawyers, Brian Mellor, Donald Wine and Ari Savitzky, will not be allowed because the timing and description of the work performed is either too vague or not submitted in any coherent form.  *See* Mellor Decl. and attachments, Doc. 89-24.  The entries for Messrs. Mellor and Wine simply state "OH/Sect7" without any further explanation.  In a similar fashion, Mr. Savitzky's entries only state "Harkless."  Behind these daily time entries are 4 pages of a description of services with no reference to the date or the individual performing the work.  Such billing records are simply inadequate, are unreviewable and will be disallowed in their entirety.

Finally, Defendants set forth objections to a number of specific billing entries. While many of the objections have merit and some of these entries raise questions about efficiency, supervision and compliance with the Local Rules, this Court is not inclined to rule on line by line objections that, overall, have little impact on the final result.

Based on the foregoing, this Court concludes that the excessive meetings, duplication of work, "over-lawyering," travel, inefficiencies and questionable billing judgment require a 50% reduction in the number of hours billed.  At the rates approved by this Court, and after elimination of the time claimed for Messrs. Mellor ($2,890), Wine ($2737) and Savittzky ($3,549) (for a total reduction of $8,365), the remaining balance is $1,089,704.  A 50% reduction results in a fee of $544,852.

4.  Lodestar Adjustment

While most of the twelve *Johnson* factors are incorporated above and are adequately considered in the lodestar, *see Burlington*, 505 U.S. at 562, Defendants separately argue that the lodestar calculation should be reduced to account for the relative lack of success obtained.  Specifically, the DJFS argues that Plaintiffs unreasonably and unnecessarily extended the litigation to obtain results substantially similar to the result they could have obtained in August of 2009 after engaging in settlement negotiations before this Court and after the DJFS extended an offer of judgment on July 6, 2009.  The DJFS challenges whether the additional 1,883.6 hours Plaintiffs expended after the DJFS made an offer of judgment on July 6, 2009, were reasonable and necessary.  *See* DJFS Mem. Opp'n 35, Doc. 114.  For the reasons set forth below, although Plaintiffs were not entirely reasonable in their demands, this Court finds that a further reduction of fees is not warranted.

Initially, Defendants assert that they were actively trying to improve voter registration at county agencies regardless of this litigation, and these improvements began while the case was pending on appeal and before the Sixth Circuit issued its decision.  Before the reversal, the SOS established a committee (of which ACORN was a member) to study improvements to county agency compliance, and Defendants implemented several procedures that had been recommended by Leadership Team based upon a memo from DEMOS, Project Vote and ACORN.  Doc. 108-17; Doc. 107-1.[41]  After the Sixth Circuit reversal, Defendants contend a quick settlement was

---

[41]  The DJFS director sent a letter to all 88 county departments reminding them of their duties to comply with the NVRA on July 18, 2008.  Doc. 107-4; Doc.

impossible because the "spirit of cooperation evaporated" and Plaintiffs insisted on unreasonable demands that were not listed by ACORN in its earlier recommendations to the committee.  DJFS Mem. Opp'n 22, Doc. 114.  The new demands included a "recapture mailing,"[42] subjecting numerous programs and offices to the NVRA that had not previously been subjected to the Act, and a requirement that Defendants require county agencies to "verbally ask any individual who is applying for benefits, completed a redetermination, recertification, or renewal, or reporting a change of address if s/he wishes to register to vote."  *Id. citing* Doc. 108-1 at 4; Doc. 108-2 at 6.  Although the SOS had agreed to prepare combined voter registration/declination forms, to conduct training and to perform unannounced spot checks of county agencies, Defendants maintain that the major obstacles to settlement were the recapture mailings, the "verbal ask" and the "laborious" documentation[43] by county agencies.  Defendants argue that

---

107-3.  Defendants trained staff and held video conferencing with county departments in August and October of 2008 in accordance with the suggestions of the Leadership Team.  Olson Dep. 22:1-25, Doc. 104.  Furthermore, Defendants included compliance with the NVRA as part of DJFS "management evaluation" reviews of county agency compliance with the food stamp program.  Doc. 107-1; Doc 108-17; Borman Dep. 54:1-57:22, Doc. 100.  These changes occurred before the Sixth Circuit issued its decision on October 28, 2008.

[42]  This would have "required Defendants to send a voter registration form and a self-addressed stamped envelope to the millions of Ohioans that had applied for public benefits from January 1, 2003, until some unspecified date in 2009."  DJFS Mem. Opp'n 22, Doc. 114, *citing* Doc. 108-1 *and* Doc. 108-2.

[43]  Plaintiffs demanded that county agencies be required to maintain "intake logs" and "outcome logs" detailing how declination forms were completed and, subsequently, reconcile the logs on a regular, frequent basis.  DJFS Mem. Opp'n 23, Doc. 114, and exhibits cited therein.  Defendants claimed these requirements were laborious and time consuming.

Plaintiffs abandoned these requirements in the final Settlement Agreement.[44]

Defendants also claim that the settlement is limited to actions Defendants already were performing.  They maintain that they had implemented each of these steps before the parties agreed to settle the case, even some, such as periodic monitoring and training, before the Sixth Circuit issued its opinion.[45]

Finally, the DJFS alleges ACORN cannot enforce the Settlement Agreement and obtained no substantial relief because ACORN dissolved its Ohio chapter and the national organization filed a Chapter 7 bankruptcy.

---

[44] Defendants contend that, in the Settlement Agreement, the documentation requirement is dropped completely, the verbal ask is only "suggested," and the substantive recapture claims are dropped, including only efforts to "continue" working in partnership with the Ohio Department of Rehabilitation and Correction to educate convicted felons about their voting rights and to "seek the agreement" of the Federal Department of Veteran Affairs to designate certain veterans offices as voting agencies.  DJFS Mem. Opp'n 24-25, Doc. 114.

[45] Defendants assert there "are five key elements to the Settlement Agreement: (1) voter registration forms are now attached to applications for public benefits; (2) the CRIS-E computer system is now updated to include data collection on voter registration; (3) county agencies are monitored on a periodic basis; (4) county agencies that are found to be out of compliance are forced to comply with the NVRA; and (5) county agencies are trained to comply with the NVRA."  DJFS Mem. Opp'n 27, Doc. 114.  Defendants claim that by August 2009, the DJFS had decided to attach voter registration forms to all applications for public benefits and, on Sept. 23, 2009, the DJFS proposed a new regulation, effective January 1, 2010, that required voter registration form be attached to applications for public benefits.  With regard to the CRIS-E computer system, the DJFS argues that in early May 2009 it was evaluating changes to the system, in September 2009 it was evaluating the costs of changing the CRIS-E system, in October 2009 it had decided to make changes to the CRIS-E, and on October 19, 2009 it had entered into a contract with an outside vendor to make the changes, with work to begin on November 3 and completed by December 31, 2009.  Defendants contend that items (3) and (5) of the Settlement Agreement were implemented before the Sixth Circuit issued its decision, and item (4) was implemented by May 2009.

Plaintiffs assert that they achieved outstanding results in this litigation and should be compensated accordingly and with no reduction in fees.  They claim Defendants stubbornly refused to settle the case, and this refusal caused Plaintiffs to expend additional time for which counsel should be compensated.  They also argue that:  the suit was brought on behalf of the national ACORN organization and, therefore, the dissolution of the Ohio chapter is irrelevant; ACORN's national organization did not file bankruptcy until after the parties entered into the Settlement Agreement; and the individual Plaintiffs can enforce the Settlement Agreement.  Finally, they assert the Settlement Agreement requires mandatory, not voluntary, compliance with the NVRA and the Settlement Agreement accomplished significantly more than the DJFS was willing to undertake voluntarily, and more than an advisory Leadership Counsel could obtain.  According to Plaintiffs, the Settlement Agreement guarantees compliance with the NVRA, and the changes Defendants made occurred precisely because Plaintiffs initiated this lawsuit.[46]

With regard to the offer of judgment the DJFS made in July 2009, Plaintiffs claim the offer not only failed to include any obligations on the part of the SOS, but was

---

[46] Other than conducting training sessions, Plaintiffs contend Defendants either had not agreed to, or had not implemented, the significant changes mandated by the Settlement Agreement prior to entering into that agreement.  Plaintiffs contend that the depositions they took in this litigation showing wide spread non-compliance with the NVRA and the reasonable costs associated with changing the CRIS-E system caused Defendants to implement changes that were in the Settlement Agreement.  Plaintiffs state that the DJFS learned of Mahoning County's non-compliance during a deposition taken by Plaintiffs on September 25, 2009, and the deposition of Michael McCreight on September 28, 2009, revealed that changes to the CRIS-E system would only cost about $50,000.  Pls.' Reply 5-7, Doc. 117.

"inferior in many critical respects" to the Settlement Agreement, and identify the examples quoted below:

> • The Settlement Agreement mandated that the voter registration application be attached to the benefits application and other forms, while the Offer permitted the attachment of the voter registration application as one of three options available to DJFS.
>
> • The Settlement Agreement required a change to the benefits application to add a question at the top of the form concerning voter registration as well as language advising of the availability of assistance and that a voter registration application was attached, while the Offer did none of these things.
>
> • The Settlement Agreement mandated that CRIS-E be updated to prompt for voter registration questions and to collect relevant data while the Offer gave DJFS the option of modifying CRIS-E to add voter registration questions.
>
> • The Settlement Agreement required that CDJFS NVRA Coordinators be directed to provide training for all other CDJFS employees at least annually, and for new staff or staff who are new to positions that have NVRA-related responsibilities within one month of their start date or first public contact, while the Offer contained no requirements for such trainings.
>
> • The Settlement Agreement requires the ODJFS NVRA Coordinator to review data on CDJFS performance on a monthly basis, and to begin an inquiry if any specific county has an abnormally low number of voter registrations or if the data show other abnormalities, while no such requirements were included in the Offer.

Pls.' Reply 7-8, Doc. 117.

This Court conducted the settlement conference in August 2010.  The conference began with Plaintiffs' counsel submitting a list of demands.  In this Court's view, Plaintiffs' counsel demonstrated no willingness to negotiate the terms of a reasonable settlement and, in fact, pursued and ultimately achieved remedies in settlement that would not have been awarded had this case proceeded to trial at

considerable expense to the parties.  The most significant subject of negotiation was making changes to the DJFS's CRIS-E system.  A brief explanation of the negotiations involving the CRIS-E system are necessary.

This CRIS-E system is a computerized system used by the DJFS to input data regarding benefits.  At the August 2009 settlement conference, Plaintiffs insisted that the software be modified to include voter registration questions.  While Defendants had no disagreement with this in principle, and, in fact, agreed to make changes during the next regularly scheduled software update in two or three years, they were concerned that immediate modifications would be cost prohibitive and believed the changes would cost hundreds of thousands of dollars.  At the time, the State of Ohio, like the rest of the country, was in the midst of a financial crisis, and Defendants stated they could not implement the changes without considering personnel lay-offs.  Plaintiffs declined to negotiate further and to discuss any other terms without an agreement by the DJFS  to change the CRIS-E system to include voter registration questions.  The negotiations terminated abruptly when Plaintiffs announced their position, and the DJFS agreed to obtain more information about the cost of the change.

According to Plaintiffs, and not disputed by Defendants, the cost of changing the CRIS-E system became evident when Plaintiffs took the deposition of Michael McCreight on September 28, 2009, who testified that the change to the CRIS-E system would be about $50,000.  As a result, the DJFS undertook to change the CRIS-E system and entered into a contract in mid-October 2009 to implement changes.  Within weeks, the Court held two more settlement conferences and the parties eventually reached an agreement.

The degree of reporting, management, design and wording of forms, along with the amount of oversight and control that Plaintiffs, who are private parties, sought in settlement over Defendants' activities and operations, was extensive and unnecessary to vindicate Plaintiffs' rights or to ensure compliance with the NVRA.  Furthermore, this Court believes that Plaintiffs' additional demands at the last two settlement conferences were not reasonable.  However, this does not detract from the significant impact the CRIS-E software change had on the DJFS's voter registration practices and ability to collect data.  The DJFS did not "voluntarily" agree to this change until very late in proceedings.

Although this Court questions whether any fee-paying client would have engaged counsel to pursue so stubbornly such an ambitious remedy, and whether the Court would have awarded such extensive control and monitoring of a public agency to a private entity (particularly one facing dissolution/bankruptcy) or individual, the fact remains that Plaintiffs actually achieved their most significant demands and, but for this litigation, such extensive changes would not have been made.  Furthermore, despite the dissolution of ACORN's Ohio Chapter and the Chapter 7 bankruptcy of ACORN's national organization, many of the changes required by the Settlement Agreement have been implemented, and the Settlement Agreement remains in effect, potentially enforceable by the two individual Plaintiffs, Harkless and Mardis.

For all of the foregoing reasons, this Court concludes that Defendants made substantial changes in the manner in which they assure and monitor compliance with the NVRA, and such changes would not have been made absent this litigation.  Accordingly, there should be no reduction in fees for the result obtained.

5.  Costs

The NVRA provides that the Court may award "litigation, expenses and costs."

42 U.S.C. § 1973gg-9.  Expenses and costs can also be recoverable under 28 U.S.C. §

1920.  These costs are only recoverable if they are reasonable and documented.

*Project Vote*, 2009 WL 917737, at *35.  Plaintiffs request an award of costs and

expenses in the amount of $126,440.81 in out-of-pocket expenses in this action

($101,951.55 by Dechert, $17,845.83 by DEMOS, $5,848.68 by Lawyers' Committee

and $794.75 by Project Vote) for a number of items, including, without limitation, filing

fees, transcript costs, legal research, investigators' and consultants' fees, travel, and

copying.

The SOS challenges a few specific items to Dechert's and DEMOS's charges,

and then interposes an overall objection to certain categories of expenses (including

duplication, meals, overtime and taxis), because Plaintiffs provided no records to show

the expenses were related to this particular case.

Some of the SOS's challenges to certain specific items, while not reflecting a

substantial expense, have merit and will not be allowed:  (1) $161 for overdue fines on

books, and (2) $40 for certificates of good standing charged by Luis Lopez, who did not

enter an appearance in the case.  On the other hand, the following expenses will be

allowed:  (1) $89.54 spent for computer research pertaining to a subpoena that was

never served, and (2) the hiring of a paralegal by DEMOS for four days.  The SOS has

not articulated a reasonable ground for disallowing the computer research, other than

perhaps suggesting the research was futile.  Futility alone does not justify eliminating

these expenses.  As to the paralegal hired by DEMOS, it is apparent the paralegal was

hired during intensive document review.  Moreover, the paralegal's rate was $40 per hour, which is less than the hourly rate this Court has allowed for paralegal services. There is no reason to eliminate this expense.

More troublesome areas are the charges for taxi fares in New York City, meals and overtime.  The SOS argues that there is nothing connecting these charges to this case.  While Mr. Steiner makes a general allegation in his declaration that all of the costs and expenses submitted were incurred in this case, there is no indication from the records themselves that the charges for taxis, meals and overtime were reasonable and necessarily related to this case.  Plaintiffs have not submitted any documentation that would justify the charges for transportation, meals and overtime.  While these items may reasonably be billed to clients in circumstances where counsel and staff are working long hours on a particular day, there is nothing in the submissions or reasonably apparent from the records indicating that was the situation here.  While Mr. Steiner indicates in his declaration that there can be lag times between the date a voucher is submitted and the date the expense is incurred, which may explain discrepancies, neither he nor the records provide any information justifying these expenses and indicating why these charges are appropriately billed to this case.  For example, Mr. Topp expensed taxi and dinner on October 23, 2007; yet his time for this date reflects 3.6 hours of work on this matter.  This pattern continues throughout the billing and expense records:  there is no meaningful way to connect them.  Charges for meals, taxis and overtime, absent lengthy days spent on work devoted exclusively or predominantly on this case, will not be allowed.  The Dechert firm billed $3,139.96 for an item identified as "Taxi Fare," $296.00 for "Local Taxi Charges," $193.39 for

-66-

"Overtime Dinner Expense," $813.54 for "Meals-Personal," $787.12 for "Meals-Business Conferences," $27.00 for "Overtime Travel Expenses," $643.30 for "Train Fare," $362.50 for "Staff Overtime Charges - Secretary," $162.00 for "Food and Beverage - Client," and $140.00 for "Seminar Costs - General." There is no reasonable way for this Court to determine which, if any, of these charges relate to compensable trips to Ohio, as Plaintiffs have not presented this information in any readily discernible manner. As Plaintiffs have failed to meet their burden of showing that the above expenses are reasonable, the Court will deduct the undocumented and/or unreasonable costs identified above, totaling $6,403.01.

The SOS also challenges undocumented expenses by Mr. Greenbaum (The Lawyers' Committee) and Ms. James. Contrary to the SOS's allegation, Ms. James did, in fact, itemize her $794.75 in expenses, although it is not in the most convenient format and is spread over two distinct pages with different formats. Mr. Greenbaum did not itemize his expenses in his initial submission. But, in the Reply Memorandum, he addressed this deficiency. Accordingly, the challenges to the expenses submitted by Mr. Greenbaum and Ms. James are not well taken.

In summary, the $126,440.81 in costs and expenses claimed will be reduced by $6,403.01, resulting in a total of $120,037.80.

**CONCLUSION**

For the foregoing reasons, the Magistrate Judge Recommends that Plaintiffs be

awarded fees in the amount of $544,852, and costs and expenses in the amount of

$120,037.80.

Date:  March 31, 2011                    s/ *Nancy A. Vecchiarelli*
                                         U.S. Magistrate Judge


**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**